HOME FOR AGED WOMEN *vs.* COMMONWEALTH.
RALPH B. WILLIAMS *vs.* SAME.
GEORGE WIGGLESWORTH & others, trustees, *vs.* SAME.
ROBERT C. HEATON & others, executors, *vs.* SAME.

Suffolk.    March 9, 1909. — June 1, 1909.

Present: KNOWLTON, C. J., HAMMOND, BRALEY, SHELDON, & RUGG, JJ.

*Tide Water. Navigable Waters. Sea Shore. Riparian Owner. Charles River. Charles River Basin.*

The right of a riparian owner upon navigable tide water of direct access from his land to navigable water, which is a special and peculiar right different from the public right of passage over the water, is subject to the right of the Commonwealth for the public good to take and fill the land lying below low water mark between his land and the tide water, so as to cut off direct access from his land to the navigable water.

The change in the Charles River authorized by St. 1903, c. 465, as amended by St. 1906, c. 402, was for the improvement of navigation as well as for other useful purposes, and the fact that this was one of the purposes of the Legislature was enough to warrant the legislation and the action under it, even if such a change in the river could not have been authorized for the other useful purposes alone without providing compensation for riparian proprietors.

In St. 1903, c. 465, as amended by St. 1906, c. 402, relating to the Charles River Basin, providing for the creation of a dam sufficiently high to hold back all tides and to maintain in the basin a substantially permanent water level not less than eight feet above Boston base, also for a suitable lock to be built not less than three hundred and fifty feet in length between the gates, forty feet in width and thirteen feet below Boston base in depth, with a suitable bridge or drawbridges, and authorizing also the filling of a strip of land outside the sea wall, the building of a new wall or embankment and the taking of the intervening land for a public park, the various works authorized were treated by the Legislature as parts of a single project for the public good, the building of

the embankment and the construction of the park being natural if not necessary incidents of the change in the level of the water.

The proprietors of land upon the Charles River Basin in Boston, who under St. 1850, c. 317, became owners in fee to the sea wall, did not acquire by that or other statutes any rights beyond those of ordinary riparian proprietors on a navigable river where the tide ebbs and flows.

FOUR PETITIONS, filed in the Superior Court respectively on November 25, December 9, December 11, 1908, and February 26, 1909, under St. 1906, c. 402, § 4, for the assessment by a jury of damages suffered by the several petitioners by reason of the work done by the Charles River Basin commissioners under authority of the provisions of that chapter, the petitioner in the first case being the owner of a lot of land bounded on the north by Revere Street, in Boston, on the east by Charles Street, on the south by Pinckney Street and on the west by the Charles River, the petitioner in the second case being the owner of a lot of land on the northerly side of Beacon Street numbered 424, and bounded northerly on the harbor commissioners' line, the petitioner in the third case being the owner of a lot of land on the northerly side of Beacon Street bounded southerly by Beacon Street and northerly by the Charles River, and the petitioner in the fourth case being the owner of a lot of land on the westerly side of Brimmer Street numbered 19, bounded easterly by Brimmer Street and westerly by the Charles River.

On page 424 is a reduced copy of a plan, used at the argument, showing the changes in the Charles River Basin.

In each of the cases the Commonwealth demurred to the petition. At different times between December 28, 1908, and March 1, 1909, each of the cases came on for argument before *Richardson*, J. In each case he ordered that the demurrer to the petition be overruled, and, being of opinion that the orders ought to be determined by this court before any further proceedings in the Superior Court, by agreement of the parties he reported the cases to this court for such determination.

The cases were argued together before this court on March 9, 1909.

*F. Rackemann & H. M. Davis,* for the Home for Aged Women.

*A. Whiteside,* (*W. I. Nottage* with him,) for Ralph B. Williams.

*W. H. Dunbar,* for George Wigglesworth and others, trustees.

PLAN OF LAND ALONG THE BOSTON SHORE
OF CHARLES RIVER

*H. W. Brown,* (*J. Noble, Jr.,* with him,) for Robert C. Heaton and others, executors, cited *Lyon* v. *Fishmongers' Co.* 1 App. Cas. 662 ; *Duke of Buccleuch* v. *Metropolitan Board of Works,* L. R. 5 H. L. 418 ; *Yates* v. *Milwaukee,* 10 Wall. 497 ; *Scranton* v. *Wheeler,* 179 U. S. 141 ; *Brisbine* v. *St. Paul & Sioux City Railroad,* 23 Minn. 114 ; *Union Depot Co.* v. *Brunswick,* 31 Minn. 297 ; *Meyers* v. *St. Louis,* 8 Mo. App. 266 ; *S. C.* 82 Mo. 367 ; *Rumsey* v. *New York & New England Railroad,* 133 N. Y. 79 ; *Sage* v. *Mayor of New York,* 154 N. Y. 61 ; *In re City of New York,* 168 N. Y. 134 ; *Chapman* v. *Oshkosh & Mississippi River Railroad,* 33 Wis. 629 ; *Bedlow* v. *New York Floating Dry Dock Co.* 112 N. Y. 263 ; *Langdon* v. *Mayor of New York,* 93 N. Y. 129, 144, 145, 152–154.

*D. Malone,* Attorney General, *& J. F. Curtis,* Assistant Attorney General, for the Commonwealth.

KNOWLTON, C. J. . Each of these petitioners is an owner of land extending northward, or westward, to the line of the sea wall on the southerly side of the Charles River in Boston, which wall runs from a point in the southwest corner of the stone wall of the Charlesbank, westerly to the easterly line of the Back Bay Fens. This wall, opposite the land of the several petitioners, is northerly, or westerly, of and below the line of low water. The Charles River Basin commission, acting under the St. 1903, c. 465, as amended by the St. 1906, c. 402, filed in the registry of deeds for the county of Suffolk a taking in fee of a strip of flats and lands covered by tide water, northerly of this sea wall, so far as these flats and lands are owned by private individuals or corporations other than the city of Boston, with the rights, easements, privileges and appurtenances, if any, within the limits of said parcel, so far as they belong to private individuals and to corporations other than the city of Boston, with certain exceptions not now material.

These are petitions for an assessment of damages caused to the property of the several petitioners by the taking. The Commonwealth filed a demurrer in each case, on the ground that it does not appear from the petition that any lands or rights in lands of the petitioner have been taken by the respondent. The petition in each case shows that no part of the parcel of land within the boundaries of the petitioner is included in

the portion taken by the commissioners.   The averment is that riparian and other rights, easements, privileges and appurtenances of the petitioner were annexed or appurtenant to and parcel of its estate, by reason of the situation of the property adjacent to the sea wall, and beyond to the northward, and by reason of the fact that this property was a part of the Charles River and of the navigable waters of the Commonwealth.   Without stopping now to consider the legislative acts and the consequent proceedings whereby the petitioners acquired a title to lands or flats beyond the original line of low water, we will treat the petitioners as severally having an estate in fee to the line of the sea wall.

We come at once to the question, what rights had they, if any, as riparian proprietors on the river, in these navigable waters where the tide ebbs and flows.   The general rules of law as to ownership along the shore of the sea, and in bays, harbors and inlets, both at common law and under the Colonial Ordinance of 1641–1647, have been considered repeatedly in this court by judges of great learning and ability.   *Commonwealth* v. *Charlestown*, 1 Pick. 179, 182, 184.   *Commonwealth* v. *Alger*, 7 Cush. 53, 65.   *Commonwealth* v. *Roxbury*, 9 Gray, 451, and note.   It is unnecessary to repeat at length the conclusions which have been reached and stated by the court.   It will be necessary, however, to consider certain general doctrines, and to apply them to questions, some of which arise now for the first time in this Commonwealth.

Under the early colonial charters, all rights belonging to the English government were conferred upon its representatives in this country.   The title of the king, both the *jus publicum* and the *jus privatum*, with rights of regulation in Parliament in the interest of the people, came to the colonies, and afterwards passed to the several States.   The fee in the land under tide waters has remained in the Government, as the representative of the people, for the public use, except as affected by the Colonial Ordinance of 1647 and by private grants.   *Commonwealth* v. *Roxbury*, 9 Gray, 451, 483.   Before the adoption of that ordinance the ownership of individuals having grants on navigable waters stopped at high water mark.   But by the ordinance "it is declared, that in all creeks, coves, and other places about and

upon salt water, where the sea ebbs and flows, the proprietor, or the land adjoining, shall have propriety to the low water mark, where the sea doth not ebb above a hundred rods, and not more wheresoever it ebbs further: provided, that such proprietor shall not by this liberty have power to stop or hinder the passage of boats or other vessels, in or through any sea, creeks or coves, to other men's houses or lands." Anc. Chart. 148, 149. This title to low water mark, or to the distance of one hundred rods, is subject to rights of navigation, and fishing and fowling. *Butler v. Attorney General,* 195 Mass. 79. The right of such control as is necessary for the protection and promotion of navigation, over the flats in private ownership, is reserved to the Government, which represents the interests of all the people.

The waters and the land under them beyond the line of private ownership are held by the State, both as owner of the fee and as the repository of sovereign power, with a perfect right of control in the interest of the public. The right of the Legislature in these particulars has been treated as paramount to all private rights, and subject only to the power of the Government of the United States to act in the interest of interstate or foreign commerce. All rights granted to individuals by general laws are made subject to this paramount right of the Legislature to do what is deemed necessary for the promotion of navigation. The extension of private titles under tide water, by the ordinance of 1647, has made it proper for the Government to hold the rule of a paramount right of control of property beyond the line of private ownership more strictly than it is held in some of those States where private titles stop at high water mark.

The most important contention of the petitioners is that they have a right of access to deep water from their lands, and a right of access to their lands from the channel principally used for navigation. The waterway is a highway, and these petitioners, like every one else, have a right to pass over it in any direction. So long as this waterway extends to the line of their land, they have access to it and access to their land from it, by contiguity. So far as navigation is of importance in that place this right may have a value. It is a right which depends wholly upon the situation of their land. From this point of view, their right to pass over the water, considered by itself alone, is

like that of every other member of the public who goes upon the water.   But this right to pass over the water directly to and from the land, in connection with the use of the land, gives the land a special value.   It is a use so far connected with the land as to be a special subject for a recovery of damage if there is a wrongful interference with it.   It is a damage special and peculiar to the property, as distinguished from the general damage which comes from an interference with the right to pass up and down the river as the general public do.   Interference of this latter kind would not entitle an owner to any individual damages, because he suffers from it only as one of the general public, his suffering being the same in kind as that of the public, although greater in degree by reason of the proximity of his property.   *Blackwell* v. *Old Colony Railroad*, 122 Mass. 1.

If, before this change was made by the Charles River commissioners, one had wrongfully put an obstruction along the front of the land of one of the petitioners, and thus had shut off communication with the main channel, this would have been, as against the general public passing up and down the stream, a public nuisance, which would have given individuals no private right of recovery.   But, as against the petitioner, it would have been a private nuisance, causing him a special damage, for which he might have an action.   *Wesson* v. *Washburn Iron Co.* 13 Allen, 95.   This right of access to the highway, for travel by water, is analogous to the right of access to a highway on land.   To an abutter on a street, the opportunity to pass directly from his land to the highway is an element of value in the land.   If he does not happen to own any part of the fee of the street, the erection of a barrier on the street, along his front, to prevent passing to and from his land, would be, for the general public going up and down, a public nuisance, the inconvenience of which would give individuals no right of action.   For him it would be a private nuisance, the maintenance of which would entitle him to compensation for his special damage in the use of his property.   Under the liberal statutes of this Commonwealth, which give compensation for special and peculiar damages to those who suffer from the laying out or discontinuance of a street, or from the location and construction of a railroad, this element of value in the property, by reason of its contiguity to

a street, is made a ground for claiming damage if the street is discontinued in front of the premises.

In a sense, there is a valuable right of access to the waterway or to the street, so long as the waterway or street is there. But it does not follow that the abutter on the waterway can insist that the Government shall make no change in the waterway on its own land, in the interest of more convenient and valuable navigation, which shall leave him with a less convenient passageway to the channel, or perhaps with no passageway at all. The Government has this paramount right to do what is necessary for the public good, in promoting better navigation. The benefits enjoyed by the abutting landowner are held subject to the possibility of diminution or loss by the exercise of this right. In like manner on a street, while no one can cut off the abutter from access to the street in front of his premises, it does not follow that the Government, having once laid out the street, is bound to maintain it there forever, and that, as against the Government, the abutter has acquired a right of property to have it so maintained for his individual benefit. The right of access by reason of his proximity, while the street remains there, gives his property value, derived in part from the probability that these conditions will remain. But if the public interest requires the discontinuance of the street, his right of access to it so long as it remains a street comes to an end. The street may be discontinued if the State determines that the public interest requires the discontinuance of it. Many members of the public may suffer from the discontinuance, property owners in the neighborhood, and others. An abutter on the part discontinued may suffer more than others, and his property may be so situated that he suffers special and peculiar damages, different from those of the public who are simply deprived of the right to pass longitudinally along the street. His damage may be such as to make it proper to give him compensation; but by the original construction of the street, he did not acquire, as against the Government, a new right of property, such that the discontinuance of the street will take from him a part of his estate that can only be taken under the right of eminent domain.

The erection of many kinds of public works increases the value of property in the neighborhood by reason of their prox-

imity, and this increase is often a reason for a special taxation of real estate. After the erection of the South Terminal Station in Boston, there was special taxation upon real estate, covering a very large area, because of the increase of its value from the establishment of the station there. *Sears* v. *Street Commissioners*, 180 Mass. 274. If for good reasons, in the public interest, the Legislature should provide for the removal of this station, it can hardly be contended that the diminution of the value of property in the neighborhood would entitle the owners to compensation as for a taking of their property under the right of eminent domain.

An element of value in the property by reason of its situation in reference to public works or to other desirable property in the neighborhood, such that an unlawful act affecting people in the exercise of their public rights would affect it specially, and make that which is a public nuisance to others a private nuisance to this property, or such as would render a change in the other property, or in the public works, a cause of special and peculiar damage to this property, from a deprivation which would affect other persons or estates only generally, is to be distinguished from an element of value which is inherent in the property itself, apart from the relations of other property to it. This distinction has often been overlooked.

That the right of access to and from property so situated is held subject to changes in the condition of the public property, made under the paramount authority of the Government in the interest of better navigation, has been recognized by courts of high authority. In *Sage* v. *Mayor of New York*, 154 N. Y. 61, 79, the court said: "Although, as against individuals, or the unorganized public, riparian owners have special rights to tide water that are recognized and protected by law, as against the general public, as organized and represented by government, they have no rights that do not yield to commercial necessities, except the right of pre-emption, when conferred by statute, and the right to wharfage when protected by a grant and covenant on the part of the State, as in *Langdon* [93 N. Y. 129] and *Williams* [105 N. Y. 419]. . . . So, it seems to me, when any public authority conveys land bounded by tidewater, it is impliedly subject to those paramount uses to which the Government,

as trustee for the public, may be called upon to apply the water front for the promotion of commerce and the general welfare." This states the well established law of New York. The fact that corporations serving the public under legislative authority are held in that State to have less rights as against individual property owners than the Government itself does not diminish the weight of this doctrine, as affecting cases like those now before us. The fundamental reason for the rule is the same as that in Massachusetts. Although early colonial grants are considered in the opinion, ultimately the right depends upon the inherent and paramount power of the Government, as the representative of the whole public, which power has always been retained by the Legislature, except when plainly limited by an express grant. The case of *Gibson* v. *United States*, 166 U. S. 269, which arose in Pennsylvania, fully covers the question which we are considering. A dike had been constructed, which substantially destroyed the landing of the claimant by preventing free ingress and egress to and from the landing on and in front of the claimant's farm, whereby she had communication with the navigable channel of the Ohio River. The court said: " In short, the damage resulting from the prosecution of this improvement to a navigable highway, for the public good, was not a result of a taking of appellant's property, and was merely incidental to the exercise of a servitude to which her property had always been subject." The doctrine is stated in *Transportation Co.* v. *Chicago*, 99 U. S. 635, 642, in these words: " Acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair its use, are universally held not to be a taking within the meaning of the constitutional provision. They do not entitle the owner of such property to compensation from the State or its agents, or give him any right of action." This case arose under the law of Illinois. The claim was for being deprived of access to the plaintiff's property on the side of the river and the side of the street, in connection with the construction of a tunnel under the Chicago River. The distinction between a right which will entitle one to compensation for an injury by a private person and a right which must be paid for by the Government, if property is affected by the exercise

of governmental power, is referred to in the opinion. The case of *Shively* v. *Bowlby*, 152 U. S. 1, contains a statement of the law by Mr. Justice Gray, and an elaborate review of the authorities, by which it appears that there is some diversity in the laws of different States; but the doctrine stated in the above quotations is well supported by authority. In *Scranton* v. *Wheeler*, 179 U. S. 141, 163, 164, the opinion of the court contains this language: " If the riparian owner cannot enjoy access to navigability because of the improvement of navigation by the construction away from the shore line of works in a public navigable river or water, and if such right of access ceases alone for that reason to be of value, there is not, within the meaning of the Constitution, a taking of private property for public use, but only a consequential injury to a right which must be enjoyed, as was said in the *Yates* case [10 Wall. 497], ' in due subjection to the rights of the public ' — an injury resulting incidentally from the exercise of a governmental power for the benefit of the general public, and from which no duty arises to make or secure compensation to the riparian owner." In the case before us, the changes were made below low water mark, outside of the line of the shore. See also *Barney* v. *Keokuk*, 94 U. S. 324 ; *Illinois Central Railroad* v. *Illinois*, 146 U. S. 387 ; *New Orleans Gas Light Co.* v. *Drainage Commission*, 197 U. S. 453 ; *Union Bridge Co.* v. *United States*, 204 U. S. 364 ; *Stevens* v. *Paterson & Newark Railroad*, 5 Vroom, 532 ; *Mills* v. *United States*, 46 Fed. Rep. 738.

The power of the Government to control, in the public interest, lands under tide water outside of the line of private ownership, under the colonial ordinance of 1647, has always been maintained by the Legislature and courts of this Commonwealth. *Commonwealth* v. *Charlestown*, 1 Pick. 179, 182, 184. *Davidson* v. *Boston & Maine Railroad*, 3 Cush. 91, 105, 106. *Commonwealth* v. *Roxbury*, 9 Gray, 451, 492, and note. *Commonwealth* v. *Essex Co.* 13 Gray, 239, 247. *Harvard College* v. *Stearns*, 15 Gray, 1. *Commissioners on Inland Fisheries* v. *Holyoke Water Power Co.* 104 Mass. 446, 449. *Fay* v. *Salem & Danvers Aqueduct*, 111 Mass. 27. *Thayer* v. *New Bedford Railroad*, 125 Mass. 253. *Attorney General* v. *Jamaica Pond Aqueduct*, 133 Mass. 361, 365. *Commonwealth* v. *Boston Terminal Co.* 185 Mass. 281.

The petitioners place great reliance upon the English. deci-sions in *Lyon* v. *Fishmongers' Co.* 1 A. C. 662, *Duke of Buccleuch* v. *Metropolitan Board of Works*, L. R. 5 H. L. 418, and *Metro-politan Board of Works* v. *McCarthy*, L. R. 7 H. L. 243. These cases arose under statutes referred to by the Lord Chancellor in his opinion in the first of them, in which valuable rights in prop-erty, by reason of its situation in reference to existing conditions, are recognized, and made a subject for compensation in damages when these conditions are changed under the authority of law. They are analogous to our own statutes which give damages for the laying out or discontinuance of highways, and for the loca-tion and construction of railroads, and for many other public acts, not only to those whose property is taken, but to those who suffer special and peculiar damages to their property which is not taken. Moreover, it has been recognized in earlier cases that the law of England is somewhat more liberal than that of Massachusetts in awarding damages for interference with advan-tages in the use of private property. *Brayton* v. *Fall River*, 113 Mass. 218, 227, 228. *Stanwood* v. *Malden*, 157 Mass. 17, 18. While these decisions recognize the existence of valuable ripa-rian rights at common law in owners upon navigable streams, they do not indicate that these rights are paramount to the right of Parliament to make improvements in the stream, in the interest of navigation, over land belonging to the Crown, with-out compensation to riparian proprietors, and they do not require us to hold, under the colonial ordinance of Massachusetts, that a change by the Government in the flow of tide waters below low water mark is a taking of the property of a riparian owner, even if it cuts off direct access from his land to navigable water.

Thus far we have considered particularly the claim of the petitioners to damages for interference with their way of ap-proach to a navigable highway. It is contended that they have other valuable rights as riparian proprietors. It is to be noticed, first, that the nature of their ownership on the border of tide water differs from the ownership of a riparian proprietor upon an unnavigable river or small stream. The title of the owner, in the latter case, goes to the thread of the stream, or if his estate extends beyond the stream, he owns all the land under the water, with a right to the flow of the water, which goes with

the land as a part of the real estate included in his ownership. The State has no ownership of any part of these small streams, nor any control over them, except such as it has in all parts of its domain for governmental purposes. But the common law and the colonial ordinance give owners on the shore of the sea, or on navigable tide water in bays, harbors and inlets, only a limited right beyond the line of their private ownership. Their right is that of members of the public for whose benefit the property is held by the State, with such special advantages to their property in the use of these public rights as come from its contiguity. Their rights, to be used in connection with their property, like the rights of other members of the public, are subject to the paramount right of control of the Government for the public good, however the exercise of this right of control may affect the convenience of any individual. The principles which we have already stated are applicable to such benefits, of the kind enjoyed by a riparian proprietor upon a small stream, as pertain to the ownership of property on the shore of navigable tide water.

In so holding, we are able to stop far short of the decision in *Watuppa Reservoir Co.* v. *Fall River*, 147 Mass. 548, upon a question that never has arisen in any other case in this Commonwealth, in which it was held by a majority of the court that the Commonwealth's ownership of a great pond for a public use, under the Colonial Ordinance of 1641, gave it a right to divert all the water from the pond, without compensation to landowners on a stream below; so that a person having a perfect title to land miles away, over which a stream from the great pond flowed, might have a part of his property, namely, the natural flow of the water, taken off from his land without compensation. In the present case there is no change in the property within the boundaries of the petitioners' estates, and the adjacent land and water are held in a separate ownership, for a public use, under which it may be appropriated as the interests of the public require.

It is contended by the petitioners that the changes made by the commission were not made for the improvement of navigation, and therefore were not authorized, under the rules of law stated above. In the first place, we think it would be too strict

a doctrine to hold that the trust for the public, under which the State holds and controls navigable tide waters and the land under them, beyond the line of private ownership, is for navigation alone. It is wider in its scope, and it includes all necessary and proper uses, in the interest of the public. In *Commonwealth* v. *Roxbury*, 9 Gray, 451, 483, Chief Justice Shaw, in speaking of the seashores and the land under the sea, said of the king, "that he held the same *publici juris* for the use and benefit of all the subjects, for all useful purposes, the principal of which were navigation and the fisheries." As the State is not only the holder of the title but the representative of the people, it may exercise the police power over the property, for their good. The rights of individuals, both in their persons and in the use of their property, are subject to the exercise of the police power.

The change in the Charles River under these statutes was for the improvement of navigation as well as for other useful purposes. If that was one of the purposes of the Legislature, it was enough to warrant the legislation and the action under it, even if such a change in the river could not be authorized, for the other useful purposes alone, without compensation to these petitioners. The statute under which action was taken provided, first, for the erection of a dam sufficiently high to hold back all tides and to maintain, in the basin above, a substantially permanent water level, not less than eight feet above Boston base. A suitable lock was to be built, not less than three hundred and fifty feet in length between the gates, forty feet in width, and thirteen feet in depth below Boston base, with a suitable drawbridge or drawbridges. This was designed greatly to improve navigation, in a place where, previously, it had been precarious. Connected with the plan there were doubtless other important considerations, relative to the public health and the public comfort, which properly appealed to the Legislature as the representative of the police power. In the interest of safer and more convenient navigation over the flats along the Charles River, and of the public health and comfort, the construction of the dam and the filling of a strip of land outside of the sea wall were treated by the Legislature as parts of a single project for the public good. The building of a new wall or embankment and the taking of the intervening land for a public park are required by the same

statute that directs the construction of the dam, and are natural, if not necessary incidents of the change in the level of the water. There was a sufficient reason, in the conditions and in the objects to be accomplished, for the exercise of the paramount power of the Legislature over the Commonwealth's lands under tide water.

The petitioners also contend that the statutes under which the sea wall was constructed, whereby their titles were severally extended to the wall, gave them rights beyond those of ordinary riparian proprietors where the tide ebbs and flows on a navigable river. We discover no good ground for this contention. Under the St. 1850, c. 317, they became owners in fee to the sea wall. Such advantages or disadvantages as came to their property from its situation at the edge of the water were theirs. But there was nothing to give them a title to anything beyond the stated line of their ownership. It is a familiar rule that grants by the sovereign are always to be construed strictly against the grantee. *Commonwealth* v. *Roxbury*, 9 Gray, 451, 492. *Cleaveland* v. *Norton*, 6 Cush. 380, 383.

It follows that there was no taking of the petitioners' property by the commission, and that they are not entitled to an assessment of damages under the statute. Very likely if the property along the sea wall near Beacon Street had been thought by the Legislature to have a special value, for use in connection with navigation, compensation would have been provided for the filling of the land, even though no private property is taken.

The statute calls for an assessment of betterments, growing out of the improvements to this property from these changes in the river, on which assessments it will be in the power of the petitioners to have the opinion of a jury.

In each case the entry will be

*Demurrer sustained.*