BENJAMIN MICHAELSON & others *vs.* SILVER BEACH
IMPROVEMENT ASSOCIATION, INC.

Barnstable.    December 5, 1960. — March 15, 1961.

Present: WILKINS, C.J., SPALDING, WILLIAMS, & CUTTER, JJ.

*Seashore. Beach. Navigable Waters. Real Property,* Littoral prop-
erty; Accretion; Beach; Registered land: certificate of title; Boundary.

Where the Commonwealth dredged a harbor and created with the dredged
material a beach extending from the previous low water mark into the
harbor in front of certain littoral property, there was on the facts no
such relation between the dredging project, even if it was in aid of
navigation, and the creation of the beach as to give title to the beach to
the Commonwealth, and the owner of the littoral property, who had had
title to the previous low water mark, acquired title by accretion to the
beach to the new low water mark, subject to the rights of the public to
navigation and free fishing and fowling over that portion of the beach
between high and low water mark.    [257–259]
The provisions of a transfer certificate of title to registered land have the
same conclusiveness as do the provisions of the original certificate under
G. L. c. 185, § 54.    [260]
The title of an owner of registered land whose certificate of title described
the land as bounded "by" a harbor extended to low water mark.    [260–
261]

BILL IN EQUITY, filed in the Superior Court on August 5,
1958.

The suit was heard by *R. Sullivan,* J.

*Lewis H. Weinstein, (George S. Abrams, Ruth I. Abrams,
& Robert H. Cole* with him,) for the plaintiffs.

*Victor Brogna,* for the defendant.

SPALDING, J.    This bill in equity is brought by owners of
property fronting on Wild Harbor in Falmouth against an
association of residents of Silver Beach asking (1) that the
association and its members be enjoined from using the
beach immediately in front of the plaintiffs' land for usual
beach purposes; (2) that the association and its members
be enjoined from using a public address system placed by
the association on a jetty near the property of the plain-

tiffs; and (3) that the beach area immediately in front of the plaintiffs' respective properties be declared free from prescriptive rights. A decree was entered dismissing the bill, from which the plaintiffs appealed. The judge made findings of material facts and the evidence (designated by the parties) is reported.[1] See *Cohen* v. *Santoianni,* 330 Mass. 187, 189–190.

We summarize the facts found by the judge as follows. The plaintiffs are owners in fee of summer homes on three contiguous lots bounded on the west by Wild Harbor.[2] Since sometime prior to 1949, a sea wall has protected their property. Even at the lowest tide the water came up to the wall. "At the highest tide, the water simply rose in height against the wall." In the spring of 1950, the public works department of the Commonwealth, by dredging and pumping sand from the floor of the harbor, "caused to be cast against the sea wall sufficient sand . . . so as to create a beach westerly of the sea wall, abutting the . . . [plaintiffs'] property." About the same time the department "caused to be constructed certain jetties running perpendicular to the shore line into Wild Harbor . . . for the purpose of preserving the beach which it had created." "[T]he beach and jetties . . . were solely the creation of artificial, man-made, accretion." Since 1950, the Silver Beach Improvement Association, Inc. (an association of residents of Silver Beach, a summer colony in Falmouth), and others have used the beach for usual beach purposes, such as sun-bathing, bathing, and picnicking. The association has installed a public address system on one of the jetties, primarily to aid the lifeguards on the shore. It has also posted the beach with signs "against the use by the general public . . .." The association never acquired any rights in the beach by usage, prescription or grant.

---

[1] Except for some testimony comprising slightly more than a page, the evidence is entirely documentary.

[2] The owners are Benjamin Michaelson and his wife, Frances, Charles E. Perkit and his wife, Florence, and Frank J. Giovino and his wife, Mollie.

The judge concluded that inasmuch as the beach was created by the Commonwealth it is dedicated "to the use of the general public, including, but . . . not confined to, the members of the . . . association." Accordingly, he ruled that the plaintiffs "and each of them have no title or interest in the beach created below the low water mark." He also found that the operation of the public address system was reasonable and inoffensive and did not constitute a nuisance, when used for such limited purposes. He thus declined to enjoin its continued use.

1. The principal question is whether a beach created as was this one belongs to the littoral proprietors or to the Commonwealth. For reasons appearing hereinafter, the case will be considered on the footing that the titles of all of the plaintiffs extend down to the sea wall which bounded their lots at the low water mark prior to the creation of the beach.

Under the colonial ordinance of 1641–47, which is treated as settling the common law of this Commonwealth, private ownership along the tide waters was extended to the "low water mark where the sea doth not ebb above one hundred rods, and not more wheresoever it ebbs further," subject to the public rights of navigation, fishing, and fowling. See *Butler* v. *Attorney Gen.* 195 Mass. 79, 82–83. "The waters and the land under them beyond the line of private ownership are held by the State, both as owner of the fee and as the repository of sovereign power, with a perfect right of control in the interest of the public. The right of the Legislature in these particulars has been treated as paramount to all private rights, and subject only to the power of the Government of the United States to act in the interest of interstate or foreign commerce." Knowlton, C.J., in *Home for Aged Women* v. *Commonwealth,* 202 Mass. 422, 427. If the beach had been created by accretion, which occurs "[w]hen the line between water and land bordering thereon is changed by the gradual deposit of alluvial soil upon the margin of the water" (see *Allen* v. *Wood,* 256 Mass. 343, 349), the answer would be clear; for "[i]t is settled that

where accretions are made to land along the seashore 'the line of ownership follows the changing water line.' " *Burke* v. *Commonwealth,* 283 Mass. 63, 68. See *East Boston Co.* v. *Commonwealth,* 203 Mass. 68, 75; *Allen* v. *Wood,* 256 Mass. 343, 349; Am. Law of Property, §§ 15.26–15.29. Such accumulations need not be due entirely to natural causes, provided they are not caused by the littoral owner himself. *Adams* v. *Frothingham,* 3 Mass. 352, 363. *Lovingston* v. *County of St. Clair,* 64 Ill. 56, affd. sub nom. *County of St. Clair* v. *Lovingston,* 23 Wall. 46. *Brundage* v. *Knox.* 279 Ill. 450, 468–470. *Saunders* v. *New York Cent. & H. R. R.R.* 144 N. Y. 75. See Powell on Real Property, § 984; 134 A. L. R. 467, 473 et seq. The fact that "the building of the breakwaters by public authority may have aided the operation of natural causes in the deposit of the accretions . . . does not modify the general rule that the littoral proprietor is entitled to his proportionate share of such accretions." *Burke* v. *Commonwealth,* 283 Mass. 63, 68. See *Adams* v. *Frothingham,* 3 Mass. 352; *State* v. *6.0 Acres of Land,* 101 N. H. 228, 231. Here, however, the beach was created solely by the Commonwealth in a relatively short time by its direct efforts.

The question, novel in this jurisdiction, therefore is whether the principles governing accretions have any applicability to the facts of this case. It has been established that "[e]ven a title in flats by grant from the colony or Commonwealth is subject, so long as they have not been built upon, to the authority of the legislature, for the protection of the harbors and of the public right of navigation." *Boston* v. *Richardson,* 105 Mass. 351, 362. *Home for Aged Women* v. *Commonwealth,* 202 Mass. 422, 427. *Crocker* v. *Champlin,* 202 Mass. 437, 441–442. *Jubilee Yacht Club* v. *Gulf Ref. Co.* 245 Mass. 60, 64. *Burke* v. *Commonwealth,* 283 Mass. 63, 69. Consequently it has been held that the Commonwealth may make surface land below the low water line; that title to such land belongs to the Commonwealth; and that the adjacent littoral owners have no remedy in damages. *Home for Aged Women* v. *Commonwealth,* 202 Mass. 422.

Since the case last cited has an important bearing on the
case at hand, we shall proceed to an analysis of it in consid-
erable detail.   Under a statutory scheme for the improve-
ment of the Charles River, the Charles River Basin com-
mission was empowered by St. 1903, c. 465, as amended by
St. 1906, c. 402, to erect a dam to hold back all tides, to build
a lock with a suitable drawbridge or drawbridges, to take
certain land and to fill a strip of land outside of a sea wall
for a public park.   The plaintiffs were owners of land ex-
tending down to a sea wall along the southerly side of the
basin.   Damages were sought because the commission had
filled in a strip of land outside of this sea wall, thus block-
ing direct access to the river.   This court in holding that
the plaintiffs had no remedy in damages said, "In the in-
terest of safer and more convenient navigation over the
flats along the Charles River, and of the public health and
comfort, the construction of the dam and the filling of a
strip of land outside of the sea wall were treated by the
Legislature as parts of a single project for the public good.
The building of a new wall or embankment and the taking
of the intervening land for a public park are required by
the same statute that directs the construction of the dam,
and are natural, if not necessary incidents of the change in
the level of the water" (pages 435–436).   We are of the
opinion that this case is not authority for the proposition
that whenever the Commonwealth creates new surface land,
by filling in the subsurface flats, title to such land is in-
variably in the Commonwealth.   Although the Common-
wealth controls the navigable tide waters and the land un-
der them, "for all useful purposes, the principal of which
. . . [are] navigation and the fisheries," *Commonwealth* v.
*Roxbury,* 9 Gray, 451, 483, this power is not unlimited.   In
order for the Commonwealth to have the rights exercised
and upheld in the *Home for Aged Women* case, the public
project must be related to its traditional powers in the
waters.   In that case the court was able to find that there
had been no taking of a private right because the creation
of the public park was related to the improvement of navi-

gation. It was called a natural, if not necessary, incident of the change of the water level. 202 Mass. at page 436. This is the only purpose of the project unrelated to navigation which is mentioned by the court; and if there had been an independent power to build the park, under the general power over the waters, there would have been no need for the court to have said, "The change in the Charles River under these statutes was for the improvement of navigation as well as for other useful purposes. If that was one of the purposes of the Legislature, it was enough to warrant the legislation and the action under it, even if such a change in the river could not be authorized, for the other useful purposes alone, without compensation to these petitioners." 202 Mass. at page 435.

In the case at bar there is no express finding that the dredging of Wild Harbor was a project in aid of navigation, but we assume in favor of the defendant that it was. It does not follow, however, that the Commonwealth in carrying out such a project may cast the material dredged along the shore line of littoral proprietors and thereby cut off their exclusive access to the sea. The littoral or riparian nature of property is often a substantial, if not the greatest, element of its value. This is true whether the owner uses his access to the sea for navigation, fishing, bathing, or the view. An examination of our decisions shows that the only specific powers which have been expressly recognized as exercisable without compensation to private parties are those to regulate and improve navigation and the fisheries. Whether any other powers may exist need not be decided here; but no power to build beaches for bathing purposes without compensating the littoral owners seems to have been recognized. Thus, if the Commonwealth desires to create land in connection with a project to improve navigation, there must be a connection between the two projects and this connection must be substantial and reasonable. Otherwise, there would be no limit to the Commonwealth's power. Suppose, for example, the Commonwealth caused a dredger to move along the entire

Massachusetts coast, piling up sand and rocks just below the line of private ownership. Navigation might well be improved; but, if the contention of the defendant association were followed, a public beach would be created in front of the property of all of the littoral proprietors. And, because the creating of the bar had some conceivable relation to navigation, the littoral owners would have no claim for damages. Such a result is in conflict with the whole spirit of the colonial ordinance, which granted the flats between the high and low water mark to the littoral owners, and with one of its primary purposes, which was to encourage private wharfing below the high water level. See *Storer* v. *Freeman,* 6 Mass. 435, 438; *Commonwealth* v. *Charlestown,* 1 Pick. 180, 183. It cannot be assumed that it was intended that this grant, designed to encourage the development of private means of access to the sea, could be frustrated by a project having only a colorable relation to navigation or the fisheries. To harmonize the public and the private interests, it is necessary to demand a substantial relation between the project and the public powers over navigation or the fisheries, if the Commonwealth is to create land, have title, and leave the littoral owners without a remedy in damages. The proper test is that the related project is immune from private rights only when it is so related to a project under the acknowledged public powers in the navigable waters (such as over navigation and the fisheries) that enjoyment of the latter project would be substantially impaired without the creation of the former. Such a limitation is not foreclosed by the *Home for Aged Women* case.

Under the undisputed facts of the case at bar it is clear that the creation of the beach was by no means necessary for the enjoyment of navigation in the deeper channel in Wild Harbor, if indeed navigation was the purpose of the dredging. The two projects had different and unrelated objects. There is no indication that the beach was needed to provide public access to the channel or had any other essential relation to the maintenance or use of the channel. Therefore this is not a case where the private rights are held totally subject to the reserved public powers.

Even if it is assumed that interference with the right of access may in certain circumstances constitute a taking for which the Commonwealth may be liable in damages,[1] the plaintiffs contend that the land created by the Commonwealth belongs to them as the littoral owners, as would a gradual growth of the beach by natural accretion or by accretion aided by an artificial force. This contention impresses us as sound. A littoral owner takes his property with the knowledge that the boundary may change by accretion or reliction. This is a necessary condition of owning property along tidal waters. It is further assumed that coastwise and tidal currents may be altered by public works necessary for the fisheries or navigation. Such projects may drastically change the direction and force of the natural currents. But they are in accord with the traditional and essential governmental powers to which the riparian land is held subject. Consequently the law applicable to natural accretions should govern. See *State* v. *Gill,* 259 Ala. 177, 183; *Gillihan* v. *Ciehola,* 74 Ore. 462. Thus in *Burke* v. *Commonwealth,* 283 Mass. 63, 65, a littoral owner obtained title to beach land, the build-up of which was caused by a breakwater that had been constructed "for the purpose of improving Green Harbor [in Marshfield] by protecting the entrance channel." This land was a by-product of the construction of the breakwater, and had no essential relation to the public enjoyment of the harbor. It made no difference that the land arose on the subsurface flats belonging to the Commonwealth (compare *Trustees of Hopkins Academy* v. *Dickinson,* 9 Cush. 544), or that certain nearby littoral owners thereby lost their means of direct access to the water. We see no reason why the fact

[1] And nothing here is meant to impair the established principle that an interference with free navigation, affecting the public as well as a particular littoral owner, does not "entitle . . . [the littoral] owner to any individual damages, because he suffers from it only as one of the general public, [for] his suffering . . . [is] the same in kind as that of the public, although greater in degree by reason of the proximity of his property." *Home for Aged Women* v. *Commonwealth,* 202 Mass. 422, 428. See *Davidson* v. *Boston & Maine R.R.* 3 Cush. 91, 105–106; *Blackwell* v. *Old Colony R.R.* 122 Mass. 1, 3; *Butchers Slaughtering & Melting Assn.* v. *Boston,* 214 Mass. 254, 257; *United States Gypsum Co.* v. *Mystic River Bridge Authy.* 329 Mass. 130, 135.

that the land is created, as here, by dredging should require a different result.

We have examined the decisions in other jurisdictions, some of which are set forth in the footnote, but none of them is particularly helpful on the precise problem at hand.[1] Some are based on rules which have been developed to fit local problems. Others are distinguishable on their facts. A discussion of them would not be profitable. In some jurisdictions a distinction has been made on the basis of whether the State or a third party is raising the right of the public. *Gillihan* v. *Cieloha,* 74 Ore. 462, 466–467. See *Patton* v. *Los Angeles,* 169 Cal. 521, 525–526; *Carpenter* v. *Santa Monica,* 63 Cal. App. 2d 772, 789; *Sage* v. *Mayor, Aldermen & Commonalty of New York,* 154 N. Y. 61, 83–84. There appears to be no sound reason why this distinction should be applied here.

For the reasons outlined above we are of opinion that the plaintiffs are the owners of the new beach, subject to a taking for public purposes. Since no such taking has been made, the plaintiffs are entitled to have the defendant enjoined from using the beach for usual bathing purposes, down to the low water mark. See *Butler* v. *Attorney Gen.* 195 Mass. 79.

2. The judge in effect found that all of the plaintiffs owned to the low·water mark.[2] The defendant does not challenge this finding with respect to the Michaelsons. It does, however, contend that the titles of the Perkits and Giovinos extend only to the mean high water mark and hence they could not in any event have acquired ownership in any of the new land.

In the original certificate of title issued to Horace P. Tobey in 1918 the tract (which included all of the lots here

---

[1] *Marine Ry. & Coal Co. Inc.* v. *United States,* 257 U. S. 47. *Patton* v. *Los Angeles,* 169 Cal. 521, 525. *Mallon* v. *Long Beach,* 44 Cal. 2d 199, 206. *Sage* v. *Mayor, Aldermen & Commonalty of New York,* 154 N. Y. 61, 83. *Black* v. *American Intl. Corp.* 264 Pa. 260, 262–264. See *Lorino* v. *Crawford Packing Co.* 142 Texas, 51, 57.

[2] This is implicit in his findings that all of the plaintiffs' property was "bounded on the west by Wild Harbor"; that the property of all the plaintiffs extended to the sea wall from which the water never receded even at low tide; and that "[a]t the highest tide, the water simply rose in height against the wall."

in issue) was described as bounded "Westerly still by . . . [Wild Harbor] River and by Wild Harbor." Thereafter a deed in the Perkit chain of title and also a deed in the Giovino chain expressly conveyed only to the high water mark.[1] In the transfer certificates of title issued to the Perkits and the Giovinos the western boundary of each lot is described as "by Wild Harbor." General Laws c. 185, § 54, provides: "The original certificate in the registration book, any copy thereof duly certified under the signature of the recorder or an assistant recorder and the seal of the court, and also the owner's duplicate certificate, shall be received as evidence in all courts of the commonwealth, and shall be conclusive as to all matters contained therein, except as otherwise provided in this chapter." The defendant contends, however, that the provisions of the transfer certificates are not entitled to conclusive effect under § 54; but if conclusive effect is to be given, the meaning of the words "by Wild Harbor" is ambiguous, and the underlying deeds must be examined to determine the status of the title. We are of opinion that the Legislature intended that the conclusive effect of § 54 apply equally to transfer certificates, and not merely to the "Original certificate of title . . ." described in § 49. Support for this view may be found in *Morse* v. *Revere,* 248 Mass. 569, 571. If the conclusiveness prescribed in § 54 were denied to a transfer certificate, it would follow that each time a conveyance was made, subsequent to the initial registration, all the intervening deeds would have to be examined. That can hardly have been the intent of c. 185. A certificate holder ought to be able to rely on the certificate issued to him. If it were otherwise, one of the principal purposes of the registration act (to make titles "certain and indefeasible," *Morehardt* v. *Dearborn,* 313 Mass. 40, 47) would be defeated.

It has long been established that, in the absence of a contrary intention, words in a deed such as "Westerly by Wild

---

[1] However, in the case of the deed in the Giovino chain a clause was added at the end purporting to convey the land between the high and low water marks. The effect of this addition in view of the conclusion reached hereinafter need not be decided.

Harbor," or words of similar import, convey title to the low water mark. *Mayhew* v. *Norton,* 17 Pick. 357, 359–360 ("by the harbour of Edgartown"). *Burke* v. *Commonwealth,* 283 Mass. 63, 67 ("on the Ocean"). We are of opinion that the language in the transfer certificate is unambiguous, and that the judge properly found that all the plaintiffs own to the sea wall, which was the low water mark.

It thus becomes unnecessary to decide the extent to which the upland owners would have shared in the new land if their titles had been only to the high water mark. See, however, *Allen* v. *Wood,* 256 Mass. 343; *Burke* v. *Commonwealth,* 283 Mass. 62, 68–69.

3. On the basis of the judge's finding (which has not been shown to be plainly wrong) that the defendant's operation of the public address system was "inoffensive, . . . reasonable and . . . [did] not, for such limited purposes, constitute a nuisance," the plaintiffs are not entitled to injunctive relief with respect to its operation. It may be, of course, that the public address system relates only to the association's use of these beaches now held to be improper and that the question has become academic.

The final decree is reversed and a new decree is to be entered adjudging that title to the beach area between the sea wall and Wild Harbor is in the plaintiffs, subject, however, as to that portion between the high and low water mark, to the easement of the public for the purposes of navigation and free fishing and fowling (see *Butler* v. *Attorney Gen.* 195 Mass. 79, 84), and enjoining the defendant, its officers, agents and members from entering upon and using the beach area between the sea wall and Wild Harbor. The plaintiffs are to have costs of this appeal.

*So ordered.*