White *v.* Hartigan.

Albert White & others[1] *vs.* Anne M. Hartigan, Second, trustee,[2] & others.[3]

Suffolk. October 4, 2012. - February 8, 2013.

Present: Ireland, C.J., Spina, Botsford, Duffly, & Lenk, JJ.

*Beach. Real Property*, Deed, Beach, Littoral property, Boundary, Easement. *Deed*, Construction. *Easement. Adverse Possession and Prescription. Practice, Civil*, Findings by judge, Statute of limitations. *Limitations, Statute of. Statute*, Retroactive application.

Discussion of the common-law principle that littoral property contains a moveable shoreline boundary, but that other boundaries of such property ordinarily are fixed. [407-408]

Statement that a presumption exists that littoral properties contain fixed landward boundaries absent clear intent to the contrary. [408-410]

In a civil action to quiet title in a beach parcel, a Land Court judge properly granted summary judgment in favor of the defendants that the plaintiffs, who claimed that the deeds from which they derived their fractional inter-

---

[1]Allen W. Norton; Judith A. Norton; Shauna White Smith, trustee of Quampacky Trust; Toni W. Hanover, trustee of Quampacky Trust; Andrew H. Cohn, trustee of Oyster Pond EP Trust; Richard L. Friedman, individually and as trustee of Quiet Oaks Realty Trust; John D. Hamilton, Jr., as trustee of the Oyster Pond EP Trust; Mark B. Norton; Debra White Scott; Melissa Norton Vincent, trustee of the Quiet Oaks Realty Trust.

[2]Of the Lloyd Family Nominee Trust.

[3]Andrew Kohlberg, trustee of the Jobs Neck Trust; Pamela Kohlberg, trustee of the Jobs Neck Trust; Arline Lloyd, trustee of Lloyd Family Nominee Trust; Alan S. Bressler; Lorraine D. Bressler; James G. Burris; Carol B. Maloney, trustee of Maloney Family Trust; Margaret H. Child; Henrietta M. Darrell; Norris Darrell; David G. Lloyd, trustee of Lloyd Family Nominee Trust; Lynn M. Edens; Wesley R. Edens; Fay Greene; Reginald Greene; Veronica T. Greene; Joanne V. Konig, trustee of Joanne V. Konig Revocable Living Trust, and Paul E. Konig Revocable Living Trust; Jokase Limited Partnership; Alison R. Jones; Peter W. J. Jones; Leslie J. Lederman; Mel Lederman; Gina Lowe; Margaret Burris Contessa, trustee of Burris Family Martha's Vineyard Nominee Trust; Maurice H. Hartigan, II, trustee of Lloyd Family Nominee Trust; Diego Messina; Elena C. Messina; Michael D. Myerow; Jane R. Newman; Robert W. Newman; Paul E. Konig, trustee of Joanne V. Konig Revocable Living Trust, and Paul E. Konig Revocable Living Trust; Pohogonot Trust; Bruce A. Rogal; Phyllis J. Rogal; Benson T. Ross; Susanne L. Shiel; Brendan M. Turner; William P. Maloney; Anthony C. Winch; Nancy C. Winch; Jay S. Zimmerman; Short Point Holdings, LLC.

est in the beach conveyed rights in a moveable parcel that shifted with the migration of the beach, had title to a fixed and stable parcel now covered by the ocean and had no title interest in any portion of the beach as it is presently located, where there was no language in the controlling deed expressly stating that the beach parcel created was moveable, nor was there evidence to indicate the grantor intended to convey a moveable interest. [410-413]

In a civil action brought to establish prescriptive easement rights in a beach parcel, remand was required where the decision of the Land Court judge lacked such subsidiary findings of fact as required by Mass. R. Civ. P. 52 (a) to permit adequate review. [413-420]

This court concluded that the repeal of G. L. c. 260, § 23, modifying the statute of limitations applicable to actions to prevent the establishment of prescriptive rights, applied retroactively. [420-423]

CIVIL ACTION commenced in the Land Court Department on October 29, 2004.

A motion for partial summary judgment was heard by *Charles W. Trombly, Jr.*, J., and the case was heard by him.

The Supreme Judicial Court granted an application for direct appellate review.

*Mark C. Fleming* (*Richard A. Johnston, Felicia A. Ellsworth, Leon J. Lombardi, & Lawrence P. Heffernan* with him) for Andrew H. Cohn & others.

*Brian M. Hurley* (*Randelle C. Stephenson* with him) for Jeffrey Flynn & others.

*Peter L. Puciloski* (*David L. Delaney & James B. McLindon* with him) for Andrew Kohlberg & another.

*Roger D. Matthews* for Albert White & others was present but did not argue.

LENK, J. This case involves a dispute over property rights in a 1.7 mile beach parcel on the south shore of Martha's Vineyard in Edgartown. Historically, two families — the Nortons (plaintiffs) and the Flynns (defendants)[4] — have owned the property upland from the beach. For much of the past century, the two families enjoyed a friendly relationship and both families

[4]The parties are not all members of these two families, but all title interests in the property are derived from title historically held by the respective families. See notes 9 and 10, *infra*. For ease of reference, we refer to the plaintiffs collectively as the Nortons and the defendants collectively as the Flynns.

used the beach. That relationship deteriorated in the early 1980s, and a dispute arose as to title rights to the beach. In 2004, the Nortons commenced an action in the Land Court to quiet title, ultimately claiming that they owned a fractional interest in the beach or, in the alternative, enjoyed a prescriptive easement to use it and certain land leading to it.

The Nortons' claimed title interest in the beach dates to an 1841 deed, which created the beach parcel. There is no dispute that, due to the erosion of Martha's Vineyard's southern shoreline, the beach as it existed in 1841, and even as late as 1938, is now submerged beneath the Atlantic Ocean. The Flynns claim that the Nortons have no interest in the beach as it is presently located because their title is only to the beach as it existed in 1841. The Nortons, however, contend that the deeds from which they derive their fractional interest in the beach conveyed rights in a moveable beach parcel that shifts upland with the northerly migration of the beach.[5] A Land Court judge rejected this argument and granted summary judgment for the Flynns on the title claim. At a jury-waived trial on the Nortons' alternative claim that they held a prescriptive easement to use the beach and certain land by which to access it, the judge determined that the Nortons had not met their burden of establishing a prescriptive easement. Judgment entered from which the Nortons timely appealed, and we granted the plaintiffs' application for direct appellate review.[6]

We affirm that portion of the judgment declaring that the Nortons do not have a title interest in the beach as it exists

[5]The initial complaint, filed in October, 2004, sought to quiet title to certain rights of way to access the beach, and also sought a declaration, pursuant to G. L. c. 231A, § 1, confirming the plaintiffs' entitlement to use those ways to access the beach. A Land Court judge allowed the plaintiffs' motion for a preliminary injunction enjoining certain defendants from interfering with the plaintiffs' use of asserted rights of way over the Flynn property to access the beach. In April, 2005, the judge allowed the trustees of the Pohogonot Trust, a trustee of the Job's Neck Trust, and a trustee of the High Road Trust to intervene as defendants. In their second amended complaint, filed in May, 2006, the plaintiffs sought a declaration that they had both a title interest in and prescriptive rights to the beach.

[6]Final judgment entered on April 20, 2011, and the Nortons thereafter appealed only as to their title claim and their prescriptive easement claim to the beach.

today, since their title interest is to a beach now submerged under the Atlantic Ocean. Because we conclude that the judge's findings of fact are insufficient to permit appellate review of so much of the judgment as concerns the prescriptive easement claim, we vacate that portion of the judgment and remand for further proceedings.

1. *Background.* a. *The Flynns and the Nortons.* For much of the twentieth century, the Flynns and the Nortons were the sole owners of the property in the southwestern corner of Edgartown where the beach is located. George D. Flynn, Jr. (Uncle George) and Winthrop B. Norton (Sonny) were the respective heads of these families from roughly 1950 through the early 1980s. Uncle George and Sonny were friends and generally permitted each other use of their respective properties. After Sonny's death in 1981, the Norton family undertook to sell certain parcels of their property; those parcels included purported fractional owner-ship interests in the beach and prescriptive rights to access the beach over certain portions of the Flynns' property. While expressing doubt that the Nortons in fact held any conveyable ownership interests in the beach, the Flynns took no action to stop the sales. In 1983, Richard Friedman purchased one such parcel.[7] Thereafter, he frequently rode on horseback over large portions of the Flynn property, apparently maintaining that he had the right to do so notwithstanding requests by members of both the Flynn and Norton families that he desist. A decade of negotiations and this litigation followed.

b. *Title history.* The first record title to the beach dates to 1693, when Wonnottaqunnamon, Squaw Sachim, and Jacob Washaman conveyed to Captain John Butler "certain lands, beach and meadow lands, on said Martha's Vineyard; bounded from the place commonly opened at Crackatuxett, on the east, the opening to the westward of Pokhoganett on the west; the sea on the south; and the pond, or ponds, on the north." In 1712, Butler conveyed to Captain Samuel Smith "a certain parcell of Beach," defined as a part of the property which was conveyed in the 1693 conveyance that runs "from Watsha open-

---

[7]Several years later, Friedman purchased another such parcel. Based on the record before us, these two parcels were the first and only parcels sold outside the Norton family.

ing and from thence As Sd. Beach Runs Eastward Till It Comes
To A Opening between Against Job's Neck and Poghonet."

In 1752, Captain Smith conveyed this parcel to his son Sam-
uel "Tarsha" Smith (Tarsha), along with his title interests to the
adjacent upland properties Paqua and Pohogonot.[8] Upon his
death in 1796, Tarsha conveyed his interests by will equally to
his sons Wilmot Smith (Wilmot) and Samuel Smith (Samuel),
as tenants in common. In 1841, Wilmot and Samuel's eight
heirs, Samuel having died, undertook to separate their owner-
ship interests. In a series of sequentially recorded conveyances,
the Smith property was divided into three distinct parcels (the
beach, Paqua, and Pohogonot), and then ownership was real-
located among members of the Smith family. Wilmot conveyed
all of his interest in the beach and Paqua to his four nephews;
all eight of Samuel's heirs conveyed their interests in Pohogonot
to Wilmot. As a result of these conveyances, Wilmot owned all
of Pohogonot, but none of the beach or Paqua, while Samuel's
heirs owned all of Paqua and the beach, but none of Pohogonot.

The Nortons derive their claimed interest in the beach from
Josiah H. Smith, one of Samuel's heirs. In 1888, Allen Norton,
great-grandfather of the plaintiff Allen W. Norton, conveyed all
of his interest in Paqua to Edmund G. Beetle, but retained his
fractional interest in the beach. This fractional interest in the
beach has passed down through the Norton family and been
divided and conveyed to the plaintiffs.[9] The Flynns derive their
fractional interest in the beach from the other seven heirs of

---

[8]The record does not contain any deeds showing ownership of the upland
areas of Paqua and Pohogonot prior to Captain Samuel Smith's deed convey-
ing the property to his son Samuel "Tarsha" Smith (Tarsha) in 1752. The
Nortons, however, acknowledge that, at the time of the 1712 conveyance,
Captain Smith "also owned the farmland known as Paqua and Pohogonot,
which lies north of the Beach on the west and east side of Paqua Pond
respectively."

[9]In 1875, the heirs of Josiah H. Smith, who was one of Samuel's eight
heirs, conveyed their fractional interest in the beach and Paqua to Nathaniel
Luce. Allen Norton, great-grandfather of the plaintiff Allen W. Norton, then
obtained one-half of this interest in a conveyance from Nathaniel Luce, one-
quarter of the interest in inheritance from Susan Luce, and the remaining one-
quarter in a conveyance from William H. Vincent and Elisa I. Vincent. In
1951, Eliza B. Norton, then the holder of the Norton deeded beach interest,
died and conveyed the residue of her real estate interests to her son Winthrop
B. Norton (Sonny). In 1981, Sonny died and devised one-half of the deeded

Samuel Smith. This interest has passed down through the Flynn family and been divided and conveyed to the defendants.[10]

c. *Eroding shoreline.* The southern shoreline of Martha's Vineyard is, and has been, eroding, resulting in a northerly migration of the beach. Geological surveys indicate that, in 1846, five years after the beach parcel was created by the 1841 conveyances among Samuel's heirs and Wilmot, the beach was abutted to the north by Oyster Pond, Paqua Pond, and Job's Neck Pond, and the uplands of Paqua and Pohogonot.[11] From 1846 to 2005, the shoreline eroded at a rate of roughly five feet per year near the western boundary of the beach, and at a rate of approximately seven feet per year near its eastern boundary. As a result of this erosion, the area on which the beach was

beach interest to his daughter, Wilda J. White, and one-half to his son, Allen W. Norton, for life, with the remainder to his grandson Mark W. Norton. By quitclaim deed dated July 1, 1983, Wilda J. White conveyed a twenty per cent undivided interest in her fractional interest in the beach to Richard L. Friedman. By warranty deed dated December 14, 1990, Richard L. Friedman conveyed to John D. Hamilton and Andrew H. Cohn, trustees of Oyster Pond Trust, the fractional interest in the beach that he had obtained from Wilda J. White. By deed dated January 5, 1995, Allen W. Norton, Judith A. Norton (his wife) and Mark W. Norton conveyed to Richard L. Friedman a twenty per cent undivided interest in their fractional interest in the beach. Wilda J. White died on November 14, 1999, devising in her will her one-half of the deeded beach interest to her husband, Albert A. White, for life, with the remainder to her children, Lisa Marie White, Debra White Scott, Toni Norton Hanover, and Shauna White Smith.

[10]In 1909, George D. Flynn acquired a fractional interest in the beach, as well as interests in Paqua and Pohogonot, through conveyances from Love P. Smith and Ellen Mayhew, granddaughters of Samuel Smith. George D. Flynn died on November 19, 1926, and his entire estate, including the property at issue, passed to his widow, Elizabeth D. Flynn. Elizabeth D. Flynn died on October 19, 1951, and by her will left all of her real estate on Martha's Vineyard to her children for life, with a remainder to her grandchildren. On September 13, 1974, the grandchildren of Elizabeth D. Flynn (Dorothy F. Keeler, Judith F. Fuller, Harry F. Flynn, Thomas L. Flynn, Jr., Patricia L. Coward, Florence L. Peters, John W. Lamborn, Jr., George D. Flynn Lamborn, John D. Flynn, Jr., Joan Flynn, Barbara F. Wolcott, Elinore F. Pollet, and George D. Flynn, II) conveyed their remainder interests under Elizabeth D. Flynn's will to the trustees of the Pohogonot Trust, namely John D. Flynn, Jr., Thomas L. Flynn, Jr., Judith F. Fuller, and Patricia L. Coward. By deed dated March 8, 2000, the trustees of the Pohogonot Trust conveyed to Pamela Kohlberg, trustee of the Job's Neck Trust, a parcel of land south of Little Job's Neck Pond, bounded southerly by the Atlantic Ocean.

[11]A decision sketch of the property created by the Land Court is reproduced in the Appendix.

located as recently as 1938 has been entirely covered by the
Atlantic Ocean. The beach is located currently on property that
was formerly portions of uplands — Paqua, Pohogonot, Isaac's
Neck, and Short Point — and the seaward ends of coastal ponds
— Oyster Pond, Paqua Pond, and Job's Neck Pond.[12]

2. *Title claim.* The Nortons maintain that the judge erred in
concluding that they do not hold title to any fraction of the
beach because the property to which they hold a title interest is
now located beneath the Atlantic Ocean. The Nortons do not
dispute any material fact, but do contest the judge's interpreta-
tion of the deed from which they derive their interests as creat-
ing a beach parcel with a fixed landward boundary. They maintain
that their predecessors in title created a beach parcel with a
moveable northern boundary that shifts with the landward migra-
tion of the beach. The Nortons in essence concede that, if the
beach to which they hold title interest was not a moveable
parcel, they have no title interest in the beach as presently
situated.

The allowance of a motion for summary judgment is reviewed
de novo. *Bank of N.Y.* v. *Bailey,* 460 Mass. 327, 331 (2011).
"The standard of review of a grant of summary judgment is
whether, viewing the evidence in the light most favorable to the
nonmoving party, all material facts have been established and
the moving party is entitled to judgment as a matter of law."
*Augat, Inc.* v. *Liberty Mut. Ins. Co.,* 410 Mass. 117, 120 (1991).

---

[12]The beach currently appears to be located on the former uplands of
Paqua, Pohogonot, Isaac's Neck, and Short Point. Paqua and Pohogonot
belong to the Flynns. Their title interest in Paqua derives from conveyances
from Samuel's heirs Love P. Smith and Ellen B. Mayhew. Their interest in
Pohogonot derives from Tarsha's son Wilmot, by way of conveyances to Gil-
bert W. Smith and Chauncey Crane. Their interest in Isaac's Neck derives
from Samuel Smith, who acquired such title from his sisters.

The Nortons previously held title to the upland property on the eastern end
of the beach known as Short Point. In 1958, Sonny conveyed this property to
George D. Flynn (Uncle George). Thus, at the time of trial, the Nortons had
no title interest in the formerly upland property on which the beach is pres-
ently located. We offer no view as to any interest the Commonwealth may
arguably have in the portions of the beach that have migrated into the beds of
the upland coastal ponds. See *Attorney General* v. *Jamaica Pond Aqueduct
Corp.,* 133 Mass. 361, 364 (1882) ("The great ponds of the Commonwealth
belong to the public, and, like the tide waters and navigable streams, are
under the control and care of the Commonwealth").

We consider first the common-law principles applicable to lit-
toral properties and then examine the 1841 deed that created the
beach parcel.

a. *Common-law principles of littoral property.* "There is
well-settled authority for the proposition that littoral (shoreline)
boundaries are not fixed, because natural processes of accretion
or erosion change them."[13] *Bergh* v. *Hines*, 44 Mass. App. Ct.
590, 592 (1998), citing *Phillips* v. *Rhodes*, 7 Met. 322, 325
(1843). "[T]he line of ownership [of littoral property] follows
the changing water line." *East Boston Co.* v. *Commonwealth*,
203 Mass. 68, 75 (1909). "Accretions to land bounding on a
river or the sea belong to the owners of the adjoining land."
*Allen* v. *Wood*, 256 Mass. 343, 349 (1926), citing *Deerfield* v.
*Arms*, 17 Pick. 41, 43 (1835). Conversely, if a body of water
moves landward through erosion, littoral property "will decrease
in size in order to keep the water as its boundary, even to the
point of ceasing to exist." Glasscock, Effects of Accretion and
Erosion on Coastal Property in the United States, 8 Int'l J.
Marine & Coastal L. 135, 136 (1993) (Glasscock). See *Lorusso*
v. *Acapesket Improvement Ass'n*, 408 Mass. 772, 781-782 (1990)
("when a parcel of land erodes on one side and forms accre-
tions on another, and the process continues until the original
parcel ceases to exist . . . the lot owner's proprietary interest in
the accreted land mass dissolves").

The considerations underlying this doctrine include: (1) the
interest in preserving the water-abutting nature of littoral
property; (2) the promotion of stability in title and ownership of
property as it concerns newly accreted property; and (3) the
equitable principle that a property owner who enjoys the benefit
of an increase in property when waterlines shift seaward ought
also to bear the burden of a decrease in property when water-
ines shift landward. See *St. Clair County* v. *Lovington*, 90 U.S.
(23 Wall.), 46, 68-69 (1874); Glasscock, *supra.*

A littoral property thus contains a moveable shoreline bound-

---

[13]"Accretion" is defined as "[t]he gradual accumulation of land by natural
forces, esp. as alluvium is added to land situated on the bank of a river or on
the seashore." Black's Law Dictionary 23 (9th ed. 2009). "Erosion" is defined
as "[t]he wearing away of something by actions of the elements; esp., the
gradual eating away of soil by the operation of currents or tides." *Id.* at 621.

ary, but its other boundaries ordinarily are fixed. See *Lorusso* v. *Acapesket Improvement Ass'n*, *supra* at 780-782. See also J.J. Whittlesey, Law of the Seashore, Tidewaters and Great Ponds in Massachusetts and Maine 53 (1932). Under this doctrine, the Nortons have no interest in the beach as it is presently located, because the beach has eroded beyond the landward boundary set forth in the deed that created their predecessors' title interest in the beach. See *Lorusso* v. *Acapesket Improvement Ass'n*, *supra* at 782.

b. *Deed analysis.* The Nortons assert, however, that their title interest in the beach shifts with its northward trajectory because the deeds in their chain of title contain either no landward (northern) boundary or reference as a landward boundary only moveable natural monuments, thereby creating a moveable parcel. We are not persuaded that the Nortons' predecessors in title created such an estate.

We have not previously addressed whether a littoral property may contain a moveable landward boundary, thus shielding the parcel from the legal effects of erosion.[14] A similar moveable beach claim was presented in *Brown* v. *Lakeman*, 15 Pick. 151, 153 (1833), regarding conveyance of a beach described as a

---

[14]The Nortons rely on *Anderson* v. *Devries*, 326 Mass. 127, 130, 133-134 (1950), overruled on other grounds by *M.P.M. Builders, LLC* v. *Dwyer*, 442 Mass. 87 (2004), and *Phillips* v. *Rhodes*, 7 Met. 322, 325 (1843), cases involving easements appurtenant to beaches which were held to move as the beach shifted. The easements in those cases, however, were granted explicitly to enable particular uses of the shoreline, such as swimming, bathing, and harvesting seaweed, and thus of necessity shifted with the movement of the shore. By contrast, here we are concerned with a claimed fee interest, implicating quite different considerations. Moreover, the Nortons do not suggest that there was any comparable shoreline-specific purpose in the 1841 deed to the beach.

The Nortons also place considerable reliance on *Scratton* v. *Brown*, 107 Eng. Rep. 1140 (K.B. 1825), where the court held that a conveyance of "seagrounds, oyster layings, shores, and fisheries, extended from the south at low-water mark, to the north at high-water mark," shifted with changes in such marks. *Id.* at 1140. That case is distinguishable due to the unique legal significance of the Crown's inherent ownership of the land between the high and low water marks, which was considered to exist wherever such marks might be located over time, i.e., a moveable parcel. *Id.* at 1145-1146. Thus, where the Crown conveyed such property, it conveyed a moveable parcel. *Id.* Although we have cited in dicta to *Scratton* v. *Brown*, *supra*, in a case not involving littoral property, *Percival* v. *Chase*, 182 Mass. 371, 378 (1903), we have not expressly adopted its reasoning.

"half a mile of the lower end of the beach, to be measured at highwater mark." In that case:

> "[The defendant] contended that this was a moveable boundary, and that it shifted as the beach was washed away by the sea. But the judge instructed the jury, that the half mile of beach was to be measured as it was when the devisor died, and that it was a fixed and stable freehold. And we all think that instruction was correct. A different rule would be productive of great uncertainty and litigation, and there is nothing in the will from which we can infer that the testator intended that the measurements should not be made as the beach then existed."

*Id.* at 153-154. In an analogous case in New York, the Court of Appeals of New York rejected a claim that a "cliff" serving as the landward boundary of a littoral property, which had since eroded, was intended to be a moveable boundary. See *East Hampton* v. *Kirk*, 84 N.Y. 215, 218-219 (1881). The court reasoned: "It would . . . be an unwarrantable interpretation of the transaction to hold that the cliff mentioned in the [title instrument] was a shifting boundary, so as to entitle the plaintiffs to make reprisal for the land lost by the advance of the sea out of the [upland] lands. The owners of the [upland] lands could gain nothing by accretion. They might lose by the advance of the shore line beyond the point where the cliff was originally located." *Id.* at 219. More recently, the Court of Chancery of Delaware similarly concluded that landward boundaries of littoral property remain fixed. The court held that, because the upland property owners "could not enjoy any benefit of accretion, there is no equitable rationale for requiring them to bear the burden of any erosion of the [lake] shore." *Scureman* v. *Judge*, 747 A.2d 62, 68 (Del. Ch. 1999).

As these cases make clear, at least two of the rationales for shifting seaward boundaries, a desire to promote stability in title and ownership of property, and equitable treatment of the risks and rewards borne by littoral property owners, are not applicable to landward boundaries. Indeed, those factors counsel against recognition of moveable landward boundaries. Doing so would result both in instability and confusion as to ownership of property

that erodes beyond landward boundaries and in inequitable loss of property for upland property owners. See *Brown* v. *Lakeman, supra*; *Scureman* v. *Judge, supra*. Thus, absent clear intent to the contrary, we presume that littoral properties contain fixed landward boundaries. See *Brown* v. *Lakeman, supra*.

We turn now to the Nortons' claim of a deeded interest in the beach. The controlling deed for this analysis is the 1841 deed by which Wilmot conveyed his interest in the beach to his nephews. That deed created a beach parcel separate and distinct from the upland properties of Paqua and Pohogonot, bounding the beach as it had not been previously bounded, and without reference to any prior deed or conveyance.[15] All subsequent conveyances of the beach parcel derive from this separation of the beach from the upland properties. The 1841 deed describes the beach as "bounded on the [n]orth by the arable land of Paqua and Pohogonot and by the several ponds in the vicinity; on the [s]outh by the Ocean; and extending to Jobs Neck Point on the [e]ast, and to the Oyster [P]ond opening on the [w]est."[16] The Nortons contend that the northern boundaries of "the arable land of Paqua and Pohogonot" and "the ponds" are natural, moveable features, not fixed boundaries, and therefore the grantor created a moveable parcel that would shift northward with the northerly migration of the arable land and ponds.[17]

"The basic principle governing the interpretation of deeds is

[15]The Nortons emphasize the 1712 deed from Captain Butler to Captain Smith, which conveys the beach as a separate parcel without describing a northern boundary. See part 1.b, *supra*. That deed, however, refers explicitly to the 1693 conveyance to Captain Butler, where the beach was described as bounded on the north by "the pond, or ponds." While the 1841 deed was not the first to describe separately a "beach," it was the first to describe the beach as a parcel distinct from other parcels, without reference to prior deeds or descriptions. The 1841 deed thereby created a unique beach parcel superseding any prior descriptions of the beach.

[16]The Nortons claim a title interest only in the portions of the beach presently located on upland properties that were formerly owned in common with the beach, namely Paqua and Pohogonot.

[17]As the Nortons point out, conveyances subsequent to the 1841 deed describe the beach without mention of a northern or southern boundary. These conveyances, however, derive from the 1841 deed and use the term "beach" in reference to the beach described therein. Because the 1841 deed divided the beach parcel from the uplands, which were also then divided among the Smith family, subsequent conveyances could not convey a beach that shifted onto those uplands unless the grantor or grantors held title to the uplands and thus

that their meaning, derived from the presumed intent of the grantor, is to be ascertained from the words used in the written instrument, construed when necessary in the light of the attendant circumstances." *Patterson* v. *Paul*, 448 Mass. 658, 665 (2007), quoting *Sheftel* v. *Lebel*, 44 Mass. App. Ct. 175, 179 (1998). "Whenever, in the description of land conveyed by deed, known monuments are referred to as boundaries, they must govern." *Burke* v. *Commonwealth*, 283 Mass. 63, 67 (1933). "[N]atural or permanent objects, such as streams or rivers and the shore of the sea, or highways or other lands, or artificial land marks or signs such as fences, walls, a line, a building, or a stake and stones, are to be treated as monuments or boundaries." *Temple* v. *Benson*, 213 Mass. 128, 132 (1912), and cases cited. That a natural monument may be ambulatory or impermanent does not negate its use as a boundary. See, e.g., *Marvel* v. *Regienus*, 329 Mass. 414, 418 (1952) (use of "cleared land" as natural monument established property boundary despite movement of line marking "cleared land"). When such a monument is used as a boundary, the boundary "must be taken to refer to the condition of the land at the time the deed was given." *Id.*, citing *Coogan* v. *Burling Mills*, 124 Mass. 390, 394 (1878).

The northern boundary of the beach contained in the 1841 deed is described as "the arable land of Paqua and Pohogonot and . . . the several ponds in the vicinity." No language in the deed states expressly that the interest is moveable. That the deed uses transitory natural monuments, i.e. "arable land" and "ponds," to describe the landward boundary does not itself create a transitory landward boundary. See *Marvel* v. *Regienus*, *supra*. The Nortons offer little beyond speculation as to the intent of the grantor, Wilmot, suggesting only that he could have used more "appropriate language" if he had intended to

had the right to diminish the upland property. Such was not the case in any post-1841 conveyances in the Nortons' chain of title.

For this reason, we are not persuaded by the Nortons' argument, based on an 1875 deed, in which the heirs of Josiah H. Smith conveyed to Nathaniel Luce "all our right and interest in the beach extending from Job's Neck Point to Matcha Line, so called, however the above may be located." Even if we construed this language as creating a moveable beach parcel, the grantors did not hold title to the uplands on which the beach would move, and therefore could not have conveyed a parcel that would encroach on such property.

create a fixed landward boundary. Speculation as to the grantor's intent does not suffice to overcome the presumption that the littoral property contained a fixed landward boundary. See *Brown v. Lakeman*, 15 Pick. 151, 153 (1833). Cf. *Marvel* v. *Regienus, supra.* Such speculation is in any event undermined by Wilmot's roughly contemporaneous use of comparable natural monuments as fixed boundaries. By way of example, in a deed from Wilmot to Samuel dated July 12, 1836, Wilmot describes a lot of land as bounded "on all other parts by the cleared land."

This conclusion is buttressed by certain "attendant circumstances," *Patterson* v. *Paul, supra,* i.e., the contemporaneous creation of the Paqua and Pohogonot parcels, which appear to establish a fixed northern boundary for the beach. In addition to creating the beach parcel, the 1841 deed created a separate parcel for the upland Paqua property, describing it as bounded on the north by a fence, to the east and west by ponds, "on the [s]outh by the [b]each," and as "containing about forty[-]five acres." Given the other fixed boundaries, and that Paqua is said to total forty-five acres, its fixed southern boundary, where the landward boundary of the beach was located at the time of the conveyance, can be determined.

Additionally, the sequentially recorded and separate deed by which Samuel's eight heirs conveyed the Pohogonot parcel to Wilmot described Pohogonot as bounded on the south by the "fence or [b]each." This description indicates that, at the time of the 1841 deed, a fence ran along the boundary of the arable land between the beach and the ponds named in the deed. Because the location of this boundary can be ascertained by virtue of an 1846 coastal survey, which located a fence separating Pohogonot from the beach as described in the 1841 deed, the beach's northern boundary, as it then existed, can also be derived by means of the fence. See *Marvel* v. *Regienus, supra.* See also *McGeechan v. Sherwood,* 760 A.2d 1068, 1075 (Me. 2000), quoting *Theriault* v. *Murray,* 588 A.2d 720, 722 (Me. 1991) ("The physical disappearance of a monument does not end its use in defining a boundary if its former location can be ascertained").

Moreover, there is nothing in the deed conveying Pohogonot to Wilmot to suggest that Pohogonot was to be subject to continuing diminution by a migrating beach parcel which would

retain its original size, notwithstanding its northward migration, as Pohogonot was gradually subsumed by the beach. It seems unlikely that Wilmot would have conveyed to Samuel's heirs all of his interest in Paqua and the beach in exchange for an ever-shrinking Pohogonot parcel. Cf. *Ryan* v. *Stavros*, 348 Mass. 251, 259 (1964) ("It is proper to consider the improbability that a grantor who conveyed all her adjoining land would seek to retain such a relatively useless strip").

Because there is no language in the 1841 deed expressly stating that the beach parcel created was moveable, nor is there evidence to indicate the grantor intended to convey a moveable interest, the Nortons hold title to a "fixed and stable" beach parcel. See *Brown* v. *Lakeman, supra* at 154. Because the boundaries of the parcel as it existed in 1841 are ascertainable, see *Marvel* v. *Regienus, supra*, and are in an area that is now completely covered by the Atlantic Ocean, the Nortons have no title interest in any portion of the beach as it is presently located. Therefore, the judge correctly granted summary judgment in favor of the Flynns on the Nortons' title claim.

3. *Prescriptive easement claim.* The Nortons maintain that, even if they do not have a deeded fractional interest in the beach, they have established a prescriptive easement to use the entire beach, from Oyster Pond on the west to Little Job's Neck Pond on the east. An easement by prescription is acquired by the (1) continuous and uninterrupted, (2) open and notorious, and (3) adverse use of another's land (4) for a period of not less than twenty years. See *Ryan* v. *Stavros, supra* at 263, citing *Nocera* v. *DeFeo*, 340 Mass. 783, 783 (1959); G. L. c. 260, § 21. It is the claimant's burden to satisfy each of these elements. *Gadreault* v. *Hillman*, 317 Mass. 656, 661 (1945), and cases cited.

The Nortons assert that they used the entire beach under a claim of right, beginning no later than 1938.[18] After a thirteen-day, jury-waived trial, the judge determined that the Nortons had failed to establish that their use of the beach was adverse, open

---

[18]Although the Nortons claim to have used the beach well before 1938, they note this date as the starting point for their claimed period of adverse use. They do so because the trial judge determined that the Nortons' deeded beach interest became completely submerged by the Atlantic Ocean no later than 1938. Thus, their use of the beach thereafter would have been adverse.

and notorious, and for a period of twenty years. The Nortons challenge the basis for the judge's factual determinations as to each of these elements.[19]

"Whether the elements of a claim for prescriptive easement have been satisfied is essentially a factual question for the trial judge." *Denardo* v. *Stanton*, 74 Mass. App. Ct. 358, 363 (2009). "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Mass. R. Civ. P. 52 (a), as amended, 423 Mass. 1402 (1996). "On appeal, we are bound by a judge's findings of fact that are supported by the evidence, including all inferences that may reasonably be drawn from the evidence." *Twin Fires Inv., LLC* v. *Morgan Stanley Dean Witter & Co.*, 445 Mass. 411, 420 (2005). "A finding of fact by the trial judge will not be deemed 'clearly erroneous' unless the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *New England Canteen Serv., Inc.* v. *Ashley*, 372 Mass. 671, 675 (1977), citing *Marlow* v. *New Bedford*, 369 Mass. 501, 503 (1976).

Where, as here, the nature of the claim is broad, and the evidence admitted by both sides is voluminous and contradictory, it is particularly important that the judge's findings of fact be of sufficient detail, *Rapp* v. *Berry*, 398 Mass. 1004, 1005 (1986), and contain "as many of the subsidiary facts as are

---

[19]The Nortons contend also that the judge erred by not shifting the burden of proof to the Flynns to establish that the use was permissive, as required upon a plaintiff's showing of uninterrupted, continuous, open, and notorious use of the land for a period of twenty years. See *Daley* v. *Swampscott*, 11 Mass. App. Ct. 822, 827 (1981), citing *Truc* v. *Field*, 269 Mass. 524, 528-529 (1930). Insofar as the judge determined that the Nortons' use of the land was "neither adverse nor open and notorious nor" for a period of twenty years, this burden shifting was not warranted.

The Nortons maintain that the judge erred by importing an "unwarranted requirement of personal hostility into the prescription doctrine." Although the Nortons are correct that personal hostility is not necessary to establish a prescriptive easement, the nature of the relationship between the claimant and the property owner may be considered in determining whether the use of the property was adverse. See *Totman* v. *Malloy*, 431 Mass. 143, 145 (2000) ("Whether a use is nonpermissive depends on many circumstances, including . . . the nature of the individual relationship between the parties claiming ownership").

necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue." *Id.* at 1004, quoting *Denofre* v. *Transportation Ins. Rating Bur.*, 532 F.2d 43, 45 (7th Cir. 1976). See Mass. R. Civ. P. 52 (a).

a. *Judge's findings of fact.* The judge found the following.[20] In the early 1950s, Sonny and Uncle George, "the patriarchs of their respective families, . . . shared the properties and allowed each other to make use of the other's." As the families increased in size, the number of people using the beach increased accordingly. Even given the greater number of people using the beach in the 1960s and 1970s, the beach was so large that one family could "make use of a portion thereof without disturbing, or even being seen by, members of the other family." The Nortons tended to use the beach near Little Job's Neck Pond and Job's Neck Pond, "keeping their distance from the Flynn houses and the barrier beach at Oyster Pond." "If members of the Norton Family wanted to use the portion of the [b]each near Oyster Pond, as they did on several occasions, they would contact Uncle George and request permission. It was seldom if ever denied."

While attempting to resolve the conflict involving Friedman's horseback riding on Flynn property, in 1987 the parties reached an agreement allowing "Friedman and members of the Norton family [to] continue to use the ways in question while the negotiations continued." Negotiations continued for a number of years. In 1999, however, the Flynns posted a notice to prevent easement pursuant to G. L. c. 187, § 4. Any use of the beach by the Nortons, Friedman, or their guests and tenants that began in the early 1980s was "cut off" by the posting, resulting in a period of use shorter than the twenty-year period required to establish a prescriptive easement. The judge stated:

"Accordingly, I need not delve into it much further

---

[20]The judge's decision contains a section entitled "Findings of Fact," which includes twenty findings, none directly addressing the Nortons' claim of a prescriptive easement. The twenty findings are essentially identical to the undisputed facts which the judge recited in his decision on the cross motions for summary judgment on the Nortons' claim of title. Although the findings are pertinent to the issues of title and beach erosion, they do not specifically address the elements of prescriptive easement. Other portions of the decision set forth certain additional findings.

except to point out that the historical relationship between the Norton and Flynn Families, going back for many years, requires me to conclude that any use of the parcel was *permissive,* rather than adverse. In addition, there were certain unusual circumstances that precluded the clock from running on any possible claim of prescription. For example, . . . any use by the Nortons of the Road to Short Point was *not adverse* because the Nortons and Flynns had *agreed* . . . that the Nortons would still be able to use the property." (Emphasis in original.)

Although the Nortons historically stayed away from the Oyster Pond beach "because the Flynns tended to congregate there," the Nortons had begun going to that area in later years, especially after Friedman purchased his property. There were "several occasions" during that period when the Flynns "questioned the Nortons' and Friedman's right to be there and asked them to leave." The judge concluded that "the Flynns allowed and permitted the Nortons and their friends to use the Beach and ways at issue in this case."

b. *Elements of a prescriptive easement found unsupported.* We examine in turn each of the three elements of a prescriptive easement which the judge found unsupported.

i. *Open and notorious.* "To be 'open,' the use must be without attempted concealment"; to be notorious, the use must put the landowner on constructive notice of the adverse use. See *Boothroyd* v. *Bogartz,* 68 Mass. App. Ct. 40, 44 (2007). The judge made two subsidiary findings of fact pertaining to this element. He found that the length of the beach is such that individuals standing on opposite ends of it could not see each other; and the Nortons, at least prior to the 1980's, avoided the Oyster Pond beach area where the Flynns historically congregated.[21]

The Nortons maintain that the Flynns had actual knowledge

---

[21]Relying on *Gadreault* v. *Hillman,* 317 Mass. 656, 663 (1945), the judge ruled, "Where, as here, the land over which the easement is claimed is large, unenclosed, and in its natural state, the party claiming the easement faces an increased burden to show that the use was sufficiently notorious to permit an inference of knowledge and implied acquiescence on the part of the owner." However, where "the only type of use for which the land in question is suited is for 'the usual beach and bathing purposes' . . . the plaintiffs' claim cannot

of their use of the beach during the relevant periods and thus that their use was by definition open and notorious. Testimony of members of the Flynn family is replete with acknowledgments of the Nortons' use of the beach. The Flynns' theory at trial was largely that the Nortons used the beach only with their permission, necessarily implying that the Flynns had actual knowledge of the Nortons' use. Because the requirement of open and notorious use "is intended only to secure to the owner a fair chance of protecting himself," *Foot* v. *Bauman*, 333 Mass. 214, 218 (1955), a property owner's actual knowledge of a claimant's adverse use of the property satisfies this element.

The judge made no findings as to the Flynns' numerous acknowledgments of the Nortons' use of the beach. Without such subsidiary findings, we cannot review adequately the basis for the judge's determination that the Nortons' use was neither open nor notorious during the relevant periods. See *Trenz* v. *Norwell*, 68 Mass. App. Ct. 271, 277-278 (2007) (judge's bare ultimate conclusions insufficient where judge did not mention contrary evidence that "was extensive and for the most part uncontradicted").

ii. *Twenty-year period.* To establish a prescriptive easement, the adverse use must be continuous and uninterrupted for a twenty-year period. *Ryan* v. *Stavros*, 348 Mass. 252, 253 (1964), citing *Nocera* v. *DeFeo*, 340 Mass. 783, 783 (1959). The judge found that any twenty-year period of use must have concluded prior to 1999, when the Flynns effectively cut off any adverse use of the beach by posting the notice concerning G. L. c. 187, § 4.[22] Although this finding addresses any prescriptive easement claim that is premised on use beginning after 1979, it does not address the Nortons' claim that they had been using the

be defeated on the ground that the land is 'undeveloped [and] wild.' " *Labounty* v. *Vickers*, 352 Mass. 337, 348-349 (1967). Application of this heightened burden to beaches on the basis that the land is "undeveloped and wild" must accordingly be premised on a factual finding that the property was suited for uses other than the "usual beach and bathing purposes." Because the judge made no such finding, we cannot ascertain whether the imposition of a heightened burden was error.

[22]The judge found also that "unusual circumstances . . . precluded the clock from running on any possible claim of prescription," but these circumstances appear to refer to agreements between the Nortons and the Flynns as to use of beach access paths, not use of the beach itself.

beach under a claim of right since 1938, sixty-one years prior to the effective cutoff date. Therefore, we cannot adequately review the judge's finding that no twenty-year period during this sixty-one-year span was sufficient to establish a prescriptive easement.

iii. *Adverse use.* To be adverse, the use must be made under a claim of right. See *Gower* v. *Saugus*, 315 Mass. 677, 681-682 (1944), citing *Sprow* v. *Boston Albany R.R.*, 163 Mass. 330, 339 (1895). The judge determined that the Nortons' use of the beach was permissive. The Nortons maintain that the judge's finding ignored clear evidence in the record showing that the Nortons used the beach under the belief that they owned it and that the Flynns similarly believed the Nortons used the beach pursuant to a fractional ownership interest.

The evidence on the issue of permission was both considerable and contradictory. The judge found that the Nortons asked permission to use the beach at Oyster Pond, but provided no subsidiary findings in support of this determination despite unvarying testimony of members of the Norton family that they would not seek permission to use the beach because they believed they had an ownership interest in it.[23] The judge also found that the Flynns granted the Nortons permission to use the beach but again provided no subsidiary findings in support of this determination despite testimony and evidence that at least some Flynn family members believed that the Nortons used the beach pursuant to a fractional ownership interest.[24] While there is evidence that supports the judge's finding as to permissive use, there is also clear and voluminous evidence to the contrary.[25] In such circumstances, a bare conclusion without subsidiary find-

[23]Allen Norton testified that he would ask permission to go on the Flynns' property but not the beach because he "already own[ed] an interest in the beach." The Nortons' testimony concerning permission showed that, at least prior to the commencement of the negotiations over the beach rights, they would seek permission to use specific parcels of Flynn upland property, or more generally to use Flynn "property," but not specifically to use the beach.

[24]John Flynn testified that his father and Uncle George told him that the Nortons used the beach because they owned a "fractional interest in the beach," which he believed to be the case until the early 1980s. A letter written by Uncle George to John Flynn in 1982 stated, "Sonny always said 'I own a 5th of the beach.' "

[25]There was evidence that, in 1950, Sonny and Uncle George hired attorney Harry Perlstein to prepare an opinion (Perlstein opinion) as to record owner-

ings does not allow for adequate appellate review. See *Rapp* v. *Berry*, 398 Mass. 1004, 1005 (1986), quoting *Equal Employment Opportunity Comm'n* v. *United Virginia Bank/Seaboard Nat'l*, 555 F.2d 403, 406 (4th Cir. 1977) ("Where evidence is conflicting, ultimate conclusions are insufficient because they lack 'detail and exactness' "); *Taylor* v. *Burke*, 69 Mass. App. Ct. 77, 79 (2007) (where "facts were disputed and the testimony was conflicting," judge's "sparse findings [were] insufficient").

The judge's findings also do not address the full extent of the Nortons' prescriptive easement claim. The judge found that the Nortons asked permission to use the beach at Oyster Pond and that the Flynns began to question the Nortons' right to be on the beach after Friedman's arrival in the early 1980s. The Nortons' claim, however, encompasses the entire beach, not just Oyster Pond, and is based on adverse use starting in 1938, decades before Friedman purchased any property.[26] The trial decision lacks any subsidiary findings as to whether the Nortons' use of other portions of the beach prior to Friedman's arrival was permissive or adverse.

c. *Sufficiency of the findings of fact.* Rule 52 (a) of the Massachusetts Rules of Civil Procedure requires that "in all actions tried upon the facts without a jury, the court shall find the facts specially and state separately its conclusions of law thereon."

ship of the beach. Perlstein concluded that the Flynns owned three-fifths of the beach and that the Nortons owned one-fifth. Following Sonny's death in 1981, when some members of the Flynn family raised questions about the Nortons' sale of fractional interests in the beach and rights of way to the beach, the Nortons referenced the Perlstein opinion, and the questions ceased.

The judge made no findings concerning the Perlstein opinion, other than to note that the opinion relates to the beach as it existed in 1841, now submerged beneath the ocean. The opinion remains relevant, however, to the prescriptive easement claim, if it demonstrates that the Flynns knew the Nortons used the beach under a claim of right. Indeed, Uncle George's letter to John Flynn in 1982, see note 24, *supra*, appears to say as much. Additionally, in his decision granting summary judgment on the title claim, the judge noted that "the fact that the Flynn[s] acted consistent with [the Perlstein opinion] after its delivery demonstrates that the Flynn[s] believed [it] was accurate."

[26]Notably, the judge found that "the Norton family, for a long time, generally stayed away from Oyster Pond Beach." The judge's findings do not address areas of the beach other than Oyster Pond, where the Nortons' claim arguably would be stronger.

The rule "serves to (1) insure the quality of a judge's decision making process by requiring simultaneous articulation of the judge's underlying reasoning; (2) assure the parties that their claims have been fully and fairly considered; and (3) inform an appellate court of the basis on which a decision has been reached." *Cormier* v. *Carty*, 381 Mass. 234, 236 (1980). The rule "impose[s] on the judge an independent duty to articulate the essential grounds of his decision." *Schrottman* v. *Barnicle*, 386 Mass. 627, 638 (1982).

For the reasons discussed, the record does not contain such subsidiary findings of fact as are necessary to permit adequate review of the judge's conclusion that the Nortons' use of the beach was not open and notorious, adverse, or for a period of twenty years. It may well be the case that the judge credited some witnesses' testimony, in whole or part, and did not credit that of others, in whole or part, particularly where issues involved extensive contradictory testimony. See *Matsushita Elec. Corp. of Am.* v. *Sonus Corp.*, 362 Mass. 246, 254 (1972). However, because the decision is generally silent as to such matters, the meager findings do not permit us to infer the credibility determinations the judge may have made.

We take no view on whether the evidence produced at trial is sufficient to support the conclusion that the Nortons did not establish a prescriptive easement; we simply require additional findings of fact, based on this evidence, so as to permit an adequate review. See Mass. R. Civ. P. 52 (a). Because the findings do not provide us with a "clear understanding of the judge's reasoning and the basis of his decision," *Rapp* v. *Berry*, *supra* at 1005, we remand for further findings of fact.

4. *Statute of limitations.* The trustees of the Pohogonot Trust (Pohogonot trustees), who were the holders of the remainder interests in the Flynn property under the will of Elizabeth D. Flynn and were, at the time of trial, title holders to the majority of the beach, see note 10, *supra*, moved for partial summary judgment based on a defense specific to their former status as remaindermen. Their motion rests on the claim that any twenty-year period of adverse use by the Nortons could not have begun to run against them, as remaindermen, until July of 1979. Any such use, they argue, was effectively cut off in June of 1999 by

their posting of the notice to prevent easement, one month shy of the required twenty-year period. They assert that the denial of their motion for partial summary judgment was error.

General Laws c. 260, § 21, which governs actions to prevent the establishment of prescriptive rights, provides that "[a]n action for the recovery of land shall be commenced, or an entry made thereon, only within twenty years after the right of action or of entry *first accrued*, or within twenty years after the demandant or the person making the entry, or those under whom they claim, have been seized or possessed of the premises. . . ." (Emphasis supplied.) Until 1979, the right of entry or of an action to recover land, challenging the adverse use of property, did not accrue as to remaindermen until the intermediate estate expired. G. L. c. 260, § 23, repealed by St. 1979, c. 402, § 3.[27] In other words, remaindermen, such as the Pohogonot trustees, could not challenge any adverse use of the property in which they held a future interest during the term of the intermediate estate. By the same token, neither could any adverse user establish prescriptive rights against the remaindermen.

However, this statute was repealed in July, 1979, thereby permitting holders of remainder interests to bring actions challenging adverse use during the term of the intermediate estate, as well as permitting adverse users to establish prescriptive rights against remaindermen. Thus, July of 1979 was the first time that the Pohogonot trustees could have taken any action against the Nortons' purported adverse use of the beach. They did not do so, however, until June, 1999. They maintained that they need not have acted sooner because the statutory twenty-year period necessary to establish prescriptive rights could only have begun in July of 1979.

---

[27]The repealed statute provided, in relevant part,

"In the construction of sections twenty-one to thirty-one, inclusive [of c. 260], the right of entry or of action to recover land shall be held to have *first accrued* at the times, respectively, hereinafter mentioned: . . . Third, [i]f there has been such intermediate estate or if a person claims under a remainder or reversion . . . at the time when the intermediate or precedent estate would have expired by its own limitation." (Emphasis supplied.)

G. L. c. 260, § 23, repealed by St. 1979, c. 402, § 3.

The question is thus whether the repeal of G. L. c. 260, § 23, applies retroactively, i.e., whether the Nortons' twenty-year period of adverse use of the beach could have begun prior to July, 1979, such that the Pohogonot trustees would have had to have taken action prior to July, 1999, in order to terminate that adverse use. Generally, the presumption is that "all statutes are prospective in their operation, unless an intention that they shall be retrospective appears by necessary implication from their words, context or objects when considered in the light of the subject matter, the pre-existing state of the law and the effect upon existent rights, remedies and obligations." *Hanscom* v. *Malden & Melrose Gas Light Co.*, 220 Mass. 1, 3 (1914). "It is only statutes regulating practice, procedure and evidence, in short, those relating to remedies and not affecting substantive rights, that commonly are treated as operating retrospectively, and as applying to pending actions or causes of action." *Id.*, and cases cited.

General Laws c. 260, § 23, by its plain language, modified the statute of limitations, G. L. c. 260, § 21, by virtue of demarcating when the statutory twenty-year period accrues for holders of future interests.[28] Its repeal thus likewise modified the statute of limitations. Because we treat statutes of limitations as procedural, *Cosme* v. *Whitlin Mach. Works, Inc.*, 417 Mass. 643, 645-646 (1994), "[t]he general rule is that if a statute of limitations does not contain language clearly limiting its application to causes of action arising in the future, then it controls future procedure in reference to previously existing causes of action." *Anderson* v. *Phoenix*, 387 Mass. 444, 453-454 (1982), citing *Mulvey* v. *Boston*, 197 Mass. 178, 181 (1908). In light of this principle, the repeal of G. L. c. 260, § 23, applies retroactively, and the Nortons' prescriptive easement claim is not limited to adverse use beginning after July, 1979.[29]

---

[28]The Pohogonot trustees urge us to focus on the repealed statute, which they characterize as distinct from the statute of limitations. Such a characterization would not change the outcome, however, because the repealed statute, like the statute of limitations, did not create or alter substantive rights, but only applied limitations on when property rights might be asserted. Therefore, it was also procedural. See *Hanscom* v. *Malden & Melrose Gas Light Co.*, 220 Mass. 1, 3 (1914).

[29]The judge concluded properly that, although the Pohogonot trustees must

Accordingly, the Pohogonot trustees' motion for partial summary judgment was properly denied.

5. *Conclusion.* So much of the judgment as declares that the plaintiffs do not hold title to the beach is affirmed. So much of the judgment as declares that the plaintiffs have not established a prescriptive easement to use the beach is vacated. The matter is remanded to the Land Court for further proceedings, as necessary, and for findings of fact, consistent with this opinion.

*So ordered.*

be allowed "a reasonable time" after the 1979 legislative amendment within which to exercise their rights to prevent a prescriptive easement claim, such a period is significantly less than the nineteen years and eleven months it took the Pohogonot trustees to exercise their rights after the repeal of G. L. c. 260, § 23.