NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12092

OPINION OF THE JUSTICES TO THE SENATE.


Beach.  Public Land.  Real Property, Beach, Littoral property.


On May 26, 2016, the Justices submitted the following
response to a question propounded to them by the Senate.


To the Honorable the Senate of the Commonwealth of

Massachusetts:

The undersigned Justices of the Supreme Judicial Court

respectfully submit this response to the question set forth in

an order adopted by the Senate on April 13, 2016, and

transmitted to us the next day.  For reasons outlined below, we

are unable to answer specifically, either yes or no, the

question as it has been presented to us.

The order concerns a bill, House No. 753, that is presently

pending in the Senate committee on Rules, entitled "An Act

preserving public trust rights in land affected by ocean

erosion."[1]  The order indicates that "the bill was reported favorably out of the joint committee on Environment, Natural Resources and Agriculture" before being referred to the Senate committee.  The bill proposes an amendment to G. L. c. 91, § 35. Chapter 91 is the Massachusetts waterways statute; together with the regulations promulgated thereunder, it provides for extensive State regulation of the Commonwealth's interest in tidelands and other coastal and inland waterways, including great ponds.  Section 35 presently consists of one sentence: "The provisions of this chapter relative to great ponds shall apply only to ponds containing in their natural state more than ten acres of land, and shall be subject to any rights in such ponds which have been granted by the commonwealth."  The bill would add a second sentence to § 35, following the existing text, that states:  "Where sea level rise, storms, or other natural processes have caused the landward or lateral movement of a barrier beach into an area which was previously occupied by the bottom of any Great Pond or onto any other public land, the portion of the barrier beach relocated into the former bottom of the Great [P]ond or onto other public land shall be and remain in public ownership."

---

[1] We note that identically worded bills have been filed in at least three previous sessions of the Legislature.  See House No. 804 of 2013-2014 (188th General Court); House No. 254 of 2011-2012 (187th General Court); House No. 4725 of 2009-2010 (186th General Court).

The order further recites that "grave doubt exists whether the bill, if enacted, would comply with" art. 10 of the Massachusetts Declaration of Rights and the Fourteenth Amendment to the United States Constitution, and that "some decision must be made on the current bill prior to the end of this legislative session" on July 31, 2016. The order then states the question that the Senate puts to us: "Does House No. 753, if enacted, comply with" art. 10 and the Fourteenth Amendment?

We are unable to answer the question as it is presented because the meaning of some of the significant terms and concepts in the bill are unclear to us, the question itself is quite broad and not susceptible to a single yes or no answer, and a complete answer may depend on facts and circumstances we do not have before us.

1. The principal focus of the bill appears to be on the migration of barrier beaches into great ponds. It declares that any barrier beach that moves as a result of natural forces into an area that is, or perhaps at one time was, a great pond shall thereafter be deemed public land.[2,3] What constitutes a great

---

[2] The bill is not limited to the movement of beaches into great ponds. It also provides that the natural movement of a barrier beach "onto any other public land" shall result in the beach becoming public land. Neither the bill nor the order specifies whether "other public land" refers only to land owned by the Commonwealth or also includes land owned by a municipality or by the Federal government.

pond, and the significance of a body of water being a great pond, has been discussed in many of our cases. See Massachusetts Water Resources Commission, Compilation and Summarization of the Massachusetts General Laws, Special Laws, Pertinent Court Decisions, Etc., Relating to Water and Water Rights 26 (1965) (Compilation and Summarization); J.J. Whittlesey, Law of the Seashore, Tidewaters and Great Ponds in Massachusetts and Maine 12-13 and 25-31 (1932) (Law of the Seashore). It suffices to say that a pond that exceeds ten acres in its natural state is a great pond. See G. L. c. 91, § 35; 310 Code Mass. Regs. § 9.02 (2014) (defining "[g]reat [p]ond"). With limited exceptions, the waters of a great pond and the land that comprises the bed of the pond to the natural low water mark belong to the Commonwealth, and the ponds are held in trust for certain public uses. See Massachusetts Water

---

Moreover, the bill does not indicate whether the "public ownership" that would result from the migration of a barrier beach into a great pond, or onto other public land, necessarily signifies ownership by the Commonwealth. The import seems to be that a barrier beach that moves into a great pond would be in the "public ownership" of the Commonwealth. We assume that a barrier beach that moves "onto any other public land," not owned by the Commonwealth, is intended under the bill to become the property of the public entity that owns that land, which may be a municipality or the Federal government.

[3] The bill does not indicate whether it contemplates that a barrier beach, before its movement into a great pond or onto other public land, was publicly or privately owned. Presumably it could be either. We assume that the bill would apply to all barrier beaches, even those that are privately owned and those owned by a municipality or by the Federal government.

Resources Commission, Compilation and Summarization, supra;

J.J. Whittlesey, Law of the Seashore, supra.

The term "barrier beach," although central to the bill, is not defined in the bill or in the Senate's order. It does not appear to be defined anywhere in G. L. c. 91, in the regulations promulgated by the Department of Environmental Protection pursuant to G. L. c. 91, or in any other chapter of the General Laws. The term has been defined by the Department of Environmental Protection and the Office of Coastal Zone Management for environmental management purposes, i.e., to regulate development and other activities in environmentally sensitive areas;[4] we are not aware of any specific definition of

---

[4] See, e.g., 310 Code Mass. Regs. § 10.29(2) (2014), promulgated pursuant to G. L. c. 131, § 40, the wetlands protection statute. That regulation defines a "[b]arrier [b]each" for wetlands protection purposes as "a low-lying strip of land generally consisting of coastal beaches and dunes extending roughly parallel to the trend of the coast. It is separated from the mainland by a narrow body of fresh, brackish or saline water or a marsh system. A barrier beach may be joined to the mainland at one or both ends." 310 Code Mass. Regs. § 10.29(2). See also Massachusetts Barrier Beach Task Force, Guidelines for Barrier Beach Management in Massachusetts (1994). The term is also defined by the Department of Environmental Protection in a similar fashion in Title 5 of the State environmental code, which governs on-site sewage treatment and disposal. See 310 Code Mass. Regs. § 15.002 (2014).

This court has also used the term in several of its opinions, typically referring to a particular land formation at issue in a case, but never in the sense of providing a definition of the term or suggesting that it has a universally understood meaning. See, e.g., Doherty v. Planning Bd. of Scituate, 467 Mass. 560, 563 (2014); Friends & Fishers of

the term for the purpose it is being used by the Legislature here, to define the fee ownership of real property. We are reluctant to opine on the important question posed without a specific understanding of what is meant by the Legislature when it uses the term in this particular context.

Even if we were to assume the Legislature intends to define "barrier beach" in a manner similar to the existing environmental protection regulations, there is no indication that the new language is meant to apply only to those movements of barrier beaches that occur after the statute is amended. Some language in the bill suggests that it may apply as well to movements of barrier beaches that have already occurred; however, it contains no reference to a point in time past when the phrases "previously occupied by the bottom of any Great Pond" and "the former bottom of [a] Great [P]ond" are to be measured. It is conceivable, therefore, that the passage of the bill would turn an existing barrier beach that is now privately owned into public land if it is located in what was, at some undefined point in the past, "an area which was previously occupied by the bottom of any Great Pond." We make this observation to underscore the potential significance of the

Edgartown Great Pond, Inc. v. Department of Envtl. Protection, 446 Mass. 830, 832 (2006); Lorusso v. Acapesket Improvement Ass'n, 408 Mass. 772, 774, 776 (1990).

proposed change and its potential effect on existing and future property rights.

2. The question framed for our advice, like the bill itself, is not entirely clear. We are asked whether the bill, if enacted, would "comply with" art. 10 of the Declaration of Rights[5] and with the Fourteenth Amendment.[6] These constitutional provisions protect a variety of rights and interests. We assume that the question is focused on takings of real property, and that by asking whether the bill would comply with these provisions, the question in essence asks whether the bill, if

---

[5] Article 10 of the Massachusetts Declaration of Rights provides, in part: "Each individual of the society has a right to be protected by it in the enjoyment of his life, liberty and property, according to standing laws. He is obliged, consequently, to contribute his share to the expense of this protection; to give his personal service, or an equivalent, when necessary: but no part of the property of any individual can, with justice, be taken from him, or applied to public uses, without his own consent, or that of the representative body of the people. In fine, the people of this commonwealth are not controllable by any other laws than those to which their constitutional representative body have given their consent. And whenever the public exigencies require that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor. . . ."

[6] Section 1 of the Fourteenth Amendment to the United States Constitution provides: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

enacted, would effect a taking of private property for public purposes, for which just compensation would be required.

Even on that assumption, however, the question is too broad to permit a single answer. The question would require us to determine whether, in any imaginable scenario, the bill's declaration that land will be "in public ownership" would establish a physical taking of privately-owned property; and if so, whether that taking would be for a permissible public purpose. These types of issues are typically resolved in adversary litigation, on concrete sets of facts. Here there are no concrete facts. We have not been supplied with legislative facts, a report of testimony or other evidence that was before the joint committee, or other material that might inform our views on the matter presented. We have no facts pertaining to particular properties -- beaches, ponds, or adjacent properties -- that may be affected by the proposed new language. There is also no indication as to how many properties might be affected.

With the limited information we have, we cannot say definitively that there would or would not be permissible, compensable takings if this bill were enacted. There are simply too many uncertainties for us to give a single answer that would apply to all properties that might be affected, and all possible scenarios.

3.  The court recently discussed various common-law principles in White v. Hartigan, 464 Mass. 400, 407-408 (2013), that may have some bearing on the question, and, at least, will serve to illustrate some of the difficulties that the question entails.[7]  The court stated that "littoral (shoreline) boundaries are not fixed, because natural processes of accretion or erosion can change them," and that "[t]he line of ownership [of littoral property] follows the changing water line" (citations omitted). Id. at 407.  The court has applied these principles to littoral property on ponds.  See Lorusso v. Acapesket Improvement Ass'n, 408 Mass. 772 (1990).  The Lorusso case involved a coastal pond, as the bill before us seems to contemplate.[8]  The court held that certain littoral property owners on Green Pond in the town of Falmouth had acquired ownership of accretions to their property,

---

[7] In White v. Hartigan, the court expressly left open a question similar to the question on which the Justices are now being asked to opine.  The court said:  "We offer no view as to any interest the Commonwealth may arguably have in the portions of the beach that have migrated into the beds of the upland coastal ponds.  See Attorney General v. Jamaica Pond Aqueduct Corp., 133 Mass. 361, 364 (1882) ('The great ponds of the Commonwealth belong to the public, and, like the tide waters and navigable streams, are under the control and care of the Commonwealth')."  White v. Hartigan, 464 Mass. 400, 406 n.12 (2013).

[8] Neither the bill nor the Senate order expressly differentiates between inland great ponds and coastal great ponds.  Because the bill speaks of the movement of a "barrier beach" into a great pond, we believe the bill must be aimed at coastal great ponds, like those that were present in White v. Hartigan, supra.

in the former bed of the pond, that were the result (in part) of the natural movement of a barrier beach into the pond.[9] The court's opinion does not indicate, however, whether Green Pond is a great pond, and does not discuss any special principles that might apply in the case of great ponds.[10]

Generally speaking, "[a] littoral proprietor on a great pond containing more than ten acres has ownership of the soil to low water mark." Massachusetts Water Resources Commission, Compilation and Summarization, supra at 27. See, e.g., Potter

---

[9] The accretions in that case resulted from a combination of the natural landward movement of a "barrier beach" (also referred to by the court and the parties as a "sand bar") and the dumping of "spoil" (excavated soil) from a public dredging project. The court stated in relevant part:

"We begin our legal analysis by setting forth some well-established relevant principles having to do with the rights of littoral landowners. One of these is that, when the boundary between the water and the land changes by the gradual deposit of sand and clay and the like, then the line of ownership ordinarily follows the changing water line. Michaelson v. Silver Beach Improvement Ass'n, 342 Mass. 251, 253-254 (1961). A littoral owner can acquire ownership of such accretions caused by either natural processes or human intervention if they were not caused by the owner himself. Id. at 254."

Lorusso v. Acapesket Improvement Ass'n, 408 Mass. 772, 780 (1990).

[10] Parenthetically, we note that the Commonwealth was named as a defendant in the Lorusso case. It asserted no claim to the disputed land, and on appeal it urged the affirmance of the judgment of the Land Court that had determined that the littoral property owners had acquired ownership of the sand bar as an accretion to their property. Lorusso v. Acapesket Improvement Ass'n, supra at 773.

v. <u>Howe</u>, 141 Mass. 357, 359 (1886) (recognizing that ownership of private property bounded by great pond extends to natural low water mark); <u>Inhabitants of W. Roxbury</u> v. <u>Stoddard</u>, 7 Allen. 158, 167 (1863) (describing boundary of property on great pond as "to low-water mark").  The natural water lines of a great pond, as with other bodies of water, may of course change over time as a result of natural events including accretion or reliction.[11]  This would seem to be especially true in cases of coastal ponds, where the contours of the coastlines, beaches, and ponds will be affected by storms, rises in sea level, and other natural forces.  The question then becomes whether the boundaries of the littoral property on great ponds change along with these natural changes in the water lines.  It is a question that raises important and complex competing principles of private property law and the Commonwealth's protection of the public trust that were not addressed in the <u>Lorusso</u> case, <u>supra</u>.

---

[11] "Accretions are additions of alluvion (sand, sediment, or other deposits) to waterfront land; relictions are lands once covered by water that become dry when the water recedes."  <u>Stop the Beach Renourishment, Inc</u>. v. <u>Florida Dep't of Environmental Protection</u>, 560 U.S. 702, 708 (2010).  The Court described the process of "avulsion" as a sudden or perceptible change to the littoral land by natural forces, as opposed to the gradual and imperceptible change that constitutes accretion or reliction.  <u>Id</u>. at 708-709.

The issues cannot properly be resolved in an advisory opinion, at least not with the limited information we have here.[12]

4.  For these reasons, we respectfully respond to the Senate order by saying that we are unable to answer the question as it has been presented.

---

[12] Often, when the Justices are faced with a request for an advisory opinion, we invite interested individuals and organizations to submit briefs on the question or questions presented.  These briefs can provide useful background information, inform our views, and sharpen our advice.

We do not think this is a suitable occasion to request briefs, for two reasons.  First, as we have said, the scope of the question asked of us is extremely broad.  Even with the assistance of briefs, we doubt we would be able to provide a response to the question as it has been presented.  See, e.g., Answer of the Justices, 364 Mass. 838, 846-847 (1973) ("Thus, the question is 'abstract' in the sense that it cannot be answered at its present level of generality without first considering each of the multitude of factual questions which are implicit in it.  No single answer could possibly be appropriate").  Second, as we also have stated, we are mindful that significant private property rights are at stake, which will almost certainly be litigated if the bill were enacted.  In these particular circumstances, and especially in light of the breadth of the bill and the question, those rights are better left for adjudication in adversary litigation, where they can be considered on a fully developed record, with reference to concrete facts.  Cf. Opinion of the Justices, 363 Mass. 889, 898 (1973) ("Where private rights are involved . . . it would normally be inappropriate for us to give an opinion on a matter of statutory construction which could be brought to the court by the usual litigation process, initiated by the parties in interest").

The foregoing response is submitted by the Chief Justice and the Associate Justices subscribing hereto on the 26th day of May, 2016.

> RALPH D. GANTS
>
> FRANCIS X. SPINA
>
> ROBERT J. CORDY
>
> MARGOT BOTSFORD
>
> FERNANDE R.V. DUFFLY
>
> BARBARA A. LENK
>
> GERALDINE S. HINES